Justices SAYLOR, EAKIN, BAER, TODD, and McCAFFERY join the opinion.

---

57 A.3d 607

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Carolyn Ann KING, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 29, 2011.

Decided Nov. 26, 2012.

---

406

410

Enid Wolfe Harris, Kingston, Thomas B. Schmidt III, Pepper Hamilton LLP, Harrisburg, for Carolyn Ann King.

William Ross Stoycos, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.

In this capital post-conviction matter, Carolyn Ann King appeals from an order denying guilt-phase relief but granting a new sentencing hearing.

This Court has previously set forth the underlying facts. Briefly, on September 15, 1993, Appellant's co-defendant Bradley Martin received a prison visitation pass that allowed him to leave the Lebanon County prison where he was incar-

cerated. He met Appellant, with whom he was romantically involved, and failed to return to prison as required. Instead, the two traveled to Palmyra, Lebanon County, where they called upon Guy Goodman, with whom Martin was acquainted. Goodman, who was seventy-four years old, had visited Martin in prison, identifying himself as Martin's friend.

After arriving at Goodman's home, Martin struck Goodman over the head with a vase, and the pair disabled Goodman by tightly binding his wrists, ankles, and neck. They then placed various wrappings around his head, sealing them with duct tape. Finally, they carried Goodman into the basement, tying him even more securely and wrapping him in a bedspread, and then leaving him to suffocate while they stole his checkbook and credit card and fled in his car. During their flight, Appellant and Martin used Goodman's credit card and checks to pay their expenses.

Martin and Appellant were eventually apprehended in Arizona, at which time Appellant was advised of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and provided a statement to the authorities, inculpating herself and Martin in Goodman's death. Appellant repeated her confession to Lebanon County detectives who were investigating the incident. Martin also inculpated himself to the county detectives after waiving his *Miranda* rights. Shortly after Appellant was returned to Lebanon County, the common pleas court, per the Honorable Robert J. Eby, appointed M. Jannifer Weiss, Esq., of Lebanon, Pennsylvania, to represent her. Martin was represented by separate counsel.

Appellant and Martin were tried together in the Lebanon County Court of Common Pleas before Judge Eby after their motions for severance were denied. Martin declined to testify at trial, but Appellant testified in her own behalf, and her tape-recorded confession was played for the jury. At the conclusion of the guilt phase, the jury found both defendants guilty of first-degree murder, aggravated assault, robbery, theft by unlawful taking, flight to avoid apprehension, escape, and conspiracy. During the penalty phase, the Commonwealth presented two aggravating factors with respect to

Appellant, namely, that the killing was perpetrated during the commission of a felony, and that it was committed by means of torture. *See* 42 Pa.C.S. § 9711(d)(6), (8). In her mitigation case, Appellant presented evidence concerning her age at the time of the crime, her relatively minor role in the homicide, and the "catch-all" mitigating factor relating to her character and record and the circumstances of the offense. *See id.* §§ 9711(e)(4), (7), (8). At the conclusion of the hearing, the jury returned a death sentence for each defendant, having found all aggravating circumstances presented and no mitigating factors for either defendant. On direct appeal, this Court concluded that the trial court erred in permitting the jury to consider the torture aggravator, but affirmed the death sentences because at least one aggravating circumstance remained as to each defendant, and the jury found no mitigating circumstances. *See Commonwealth v. King*, 554 Pa. 331, 374, 721 A.2d 763, 784 (1998). The Supreme Court denied Appellant's petition for a writ of certiorari. *See King v. Pennsylvania*, 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000).

■ On February 14, 2000, Appellant filed a timely, *pro se* petition under the Post Conviction Relief Act ("PCRA"), *see* 42 Pa.C.S. §§ 9541–9546. Thereafter, she was given permission to file a counseled, amended petition, and her execution was stayed pending final resolution of her claims. *See Commonwealth v. King*, 561 Pa. 144, 748 A.2d 1232 (2000) (per curiam). New counsel for Appellant filed amended and supplemental petitions, raising numerous claims for collateral relief predicated on trial counsel's alleged ineffectiveness.[1] The PCRA

1. Appellant's direct appeal was resolved before this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), which held that review of claims alleging ineffective assistance of trial counsel should be deferred to the post-conviction stage. Therefore, *Grant* does not apply, *see id.* at 68–69 & n. 16, 813 A.2d at 739 & n. 16, which means that any claim of trial counsel ineffectiveness that was not advanced on direct appeal might ordinarily be deemed waived, implicating the need for "layering" as outlined in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003). Where, however, trial counsel represented the defendant on direct appeal, *McGill* layering is not required because the PCRA proceeding is the defendant's first opportunity to challenge trial counsel's stewardship. *See Commonwealth v. Hughes*, 581 Pa. 274, 298–99 & n. 7, 865 A.2d 761, 775 & n. 7 (2004).

court conducted an extensive, five-day hearing at which, *inter alia*, trial counsel stated that she was largely unprepared for the penalty phase, and forensic psychological and psychiatric experts testified concerning mitigation evidence that could have been presented in the penalty phase.[2]

The PCRA court ultimately denied Appellant's request for a new trial, finding all her guilt-phase claims meritless. It did, however, grant Appellant a new penalty hearing based on its determination that her trial counsel had rendered ineffective assistance by failing to investigate and present any mental-health mitigating evidence. *See Commonwealth v. King*, No. CP–38–CR–10898–1993, Order at iii (C.P.Lebanon, July 23, 2010) (referencing "readily available evidence of [Appellant]'s history of post-traumatic stress disorder, sexual abuse, child

The underlying theory is that it is unrealistic to expect appellate counsel to raise his or her own ineffectiveness. *See Commonwealth v. Kimball*, 555 Pa. 299, 311, 724 A.2d 326, 332 (1999).

Here, Weiss represented Appellant both at trial and on direct appeal. If she had been Appellant's only appellate counsel, layering would clearly not be required for the reasons explained above. The matter is complicated somewhat, though, because Weiss was joined by Robert Brett Dunham, Esq., during the direct appeal, and this Court has not addressed whether claims of trial counsel ineffectiveness must be pre-served on direct appeal when trial counsel obtained co-counsel for the appeal prior to *Grant*. Still, the Court has often articulated the pre-*Grant* framework by expressing that the litigant's first opportunity to raise trial counsels' ineffectiveness arises when trial counsel "no longer represents" the litigant. *See, e.g., Commonwealth v. Lesko*, 609 Pa. 128, 154, 15 A.3d 345, 360 (2011); *Commonwealth v. Tilley*, 566 Pa. 312, 319 n. 9, 780 A.2d 649, 653 n. 9 (2001); *Commonwealth v. Kenney*, 557 Pa. 195, 201, 732 A.2d 1161, 1164 (1999); *Commonwealth v. Green*, 551 Pa. 88, 92, 709 A.2d 382, 384 (1998); *Commonwealth v. Chmiel*, 536 Pa. 244, 251, 639 A.2d 9, 12 (1994); *Commonwealth v. Griffin*, 537 Pa. 447, 454, 644 A.2d 1167, 1170 (1994); *Commonwealth v. Shannon*, 530 Pa. 279, 285, 608 A.2d 1020, 1023 (1992); *Commonwealth v. Hubbard*, 472 Pa. 259, 276, 372 A.2d 687, 695 (1977). Because the PCRA stage was when Weiss first no longer represented Appellant, absent any argument to the contrary we conclude that the present claims of trial counsel ineffectiveness did not need to be preserved on direct appeal, and hence, *McGill*-style layering is not required in this case.

2. The hearing was held on November 21, 2006, and February 23, 24, 26, and 27, 2009. It was presided over by the Honorable Harold Thomson, who was appointed after Judge Eby granted Appellant's motion for recusal. *See Commonwealth v. King*, 576 Pa. 318, 839 A.2d 237 (2003) (affirming Judge Eby's decision to recuse himself).

abuse, domestic violence, depression, and drug abuse"). Appellant appealed the portion of the order dismissing her guilt-phase claims, and the Commonwealth cross-appealed, seeking reversal of the court's decision to grant a new penalty hearing. The Commonwealth later withdrew its cross-appeal, leaving Appellant's original appeal as the sole matter for resolution.[3] Our present task, therefore, is limited to evaluating the guilt-phase post-conviction claims that Appellant advances on appeal.

Since all such claims relate to an alleged deprivation of the Sixth Amendment right to competent counsel, *see McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970), Appellant may only obtain relief if she pleads and proves by a preponderance of the evidence that her conviction resulted from ineffective assistance of counsel that, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *See* 42 Pa.C.S. § 9543(a)(2)(ii). The Pennsylvania test for ineffectiveness is, in substance, the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court, *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), although this Court has divided the performance element into two sub-parts dealing with arguable merit and reasonable strategy. Thus, to succeed on an ineffectiveness claim, a petitioner must establish that: the underlying legal claim has arguable merit; counsel had no reasonable basis for her action or inaction; and the petitioner suffered prejudice as a result. *See Commonwealth v. Pierce*, 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional

3. After the Commonwealth filed its cross-appeal, docketed at 615 CAP, Appellant filed her own protective cross-appeal, raising the same issues as in her original appeal. This filing was docketed at 616 CAP. Appellant also moved to consolidate her two appeals. Ultimately, after the Commonwealth discontinued its appeal, this Court denied the consolidation request and quashed Appellant's cross-appeal as duplicative. *See Commonwealth v. King*, 610 Pa. 393, 20 A.3d 481 (2011) (per curiam).

errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord Commonwealth v. Cox,* 603 Pa. 223, 243, 983 A.2d 666, 678 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *See Commonwealth v. Ali,* 608 Pa. 71, 86–87, 10 A.3d 282, 291 (2010). No relief is due, however, on any claim that has been waived or previously litigated, as those terms have been construed in the decisions of this Court. *See* 42 Pa.C.S. § 9543(a)(3).

■ In her brief to this Court, Appellant raises several issues pertaining to the representation she received at trial. In the first such issue, Appellant contends that she is entitled to a new trial because of Attorney Weiss's inexperience in handling capital cases. Appellant does not argue actual ineffectiveness, that is, that Weiss's performance was deficient and that such deficiency resulted in *Strickland* prejudice. Rather, she maintains that she was constructively denied her Sixth Amendment right to counsel on the grounds that Weiss was a civil practitioner with little relevant experience. In short, she asserts that prejudice should be presumed because Weiss's handling of her case amounted to structural error under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *See id.* at 658–59, 104 S.Ct. at 2046–47. In support of her presumed (or *per se* ) prejudice claim, Appellant proffers that Weiss had never before tried a capital case, and had only tried one criminal case, which involved a drug charge; the funding restrictions imposed by the Lebanon County Court relating to counsel's fees and those of defense investigative experts put Appellant at a substantial disadvantage in light of the Commonwealth's more extensive resources; and Weiss would not have met the criteria embodied in Rule of Criminal Procedure 801, which this Court adopted in 2004 to govern the appointment of counsel in death-penalty cases. *See* Pa.R.Crim.P. 801 (relating to qualifications for defense counsel in capital cases).

■ Because counsel is presumed to be competent, it is ordinarily the defendant's burden to demonstrate that a constitutional violation has occurred. *Cronic* affirmed this general precept, but also recognized a narrow category of circumstances that are so likely to cause harm that prejudice should be presumed because the cost of litigating the issue is unjustified. *See Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. The *Cronic* Court explained, for example, that prejudice is assumed where counsel is absent, or "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659, 104 S.Ct. at 2047; *see, e.g., United States v. Swanson,* 943 F.2d 1070, 1074 (9th Cir.1991) (finding *per se* prejudice under *Cronic* where counsel conceded that all disputed factual issues were proved beyond a reasonable doubt). As this Court has previously explained, *Cronic*

> also indicated that, even where counsel is present, surrounding circumstances may make it so unlikely that any lawyer could provide effective assistance that ineffectiveness is appropriately presumed. The Court pointed to *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55 [77 L.Ed. 158] (1932), as an example of such a scenario, as the trial judge in that matter had, on the eve of a capital trial, appointed as defense counsel an out-of-state attorney who was unfamiliar with local customs and procedures and had had no opportunity to prepare.

*Commonwealth v. Cousin,* 585 Pa. 287, 299, 888 A.2d 710, 717 (2005) (citing *Cronic,* 466 U.S. at 660–61, 104 S.Ct. at 2047–48). "Courts have additionally assumed prejudice where counsel is physically present but substantially disabled from performing essential functions." *Id.* at 299–300, 888 A.2d at 718; *see, e.g., Geders v. United States,* 425 U.S. 80, 88, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976) (counsel prohibited from consulting with defendant during a seventeen-hour overnight recess); *Javor v. United States,* 724 F.2d 831, 834 (9th Cir.1984) (counsel present but asleep); *State v. Keller,* 57 N.D. 645, 223 N.W. 698, 700 (1929) (counsel present but severely intoxicated). *See generally Bell v. Cone,* 535 U.S. 685, 695–96 & n. 3, 122 S.Ct.

1843, 1851 & n. 3, 152 L.Ed.2d 914 (2002) (summarizing *Cronic* categories of presumed prejudice).

Although Weiss had only limited criminal trial experience, and felt that the fee cap of $5,000 was low for the amount of time she would have to spend on the case—amounting to $35.00 per hour for out-of-court work and $45.00 per hour for courtroom work, *see* N.T., Nov. 21, 2006, at 18—she was familiar with the local rules of procedure, had substantial experience as a civil litigator, and expended a significant amount time and effort in defending Appellant in the guilt phase. According to Weiss's testimony at the PCRA hearing, she: accepted appointment as defense counsel, notwithstanding her civil specialty, on the grounds that it is improper to question a trial judge's order; developed a good working relationship with Appellant; hired a medical expert to examine Appellant for competence to stand trial; expended substantial time preparing for the guilt phase; advanced a defense theory reasonably designed to negate the element of specific intent; and generally performed all of the other duties that one would normally expect of a criminal defense attorney. *See id.* at 23, 26, 36, 37, 54, 76, 78, 103; *see also id.* at 63 (reflecting counsel's assertion that "I did the very best that I could do. I worked very very hard on this case.").[4] These duties included representing Appellant at her preliminary hearing, investigating the facts of the case, meeting with Appellant before and during trial, filing and briefing an omnibus pretrial motion, requesting a change of venue, seeking severance from Martin's trial, reviewing the relevant law on the issue of guilt, obtaining a bill of particulars, obtaining discovery, filing a motion to compel disclosure, participating in voir dire, giving an opening statement, cross-examining the Commonwealth's witnesses, handling direct examination of defense witnesses, lodging and arguing evidentiary objections before and during trial, and providing a closing argument to

4. In denying this claim, the PCRA court relied heavily upon Attorney Weiss's testimony. *See Commonwealth v. King,* No. CP–38–CR–10898–1993, *slip op.* at 26–27 (C.P.Lebanon, July 23, 2010). Thus, we infer that the PCRA court found her to be a generally credible witness.

the jury. *See id.* at 85–88.[5] Moreover, our own review of the trial transcript reveals that Attorney Weiss reasonably acted in a manner calculated to advance Appellant's interests, including, *inter alia,* presenting a defense case and making appropriate arguments to the jury as to why it should acquit Appellant of the most serious charges lodged against her.[6]

In light of the above, we do not agree with Appellant that Weiss's inexperience with capital cases, or the county court's counsel and investigative fee caps, resulted in a constructive denial of counsel so as to give rise to structural error. Indeed, this Court rejected a similar argument in *Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294 (2008), a matter in which trial counsel was subject to a $3,500 fee ceiling and was provided $500 for a private investigator. In *Williams,* defense counsel testified at the PCRA hearing that he was a single attorney assigned to a capital case with little budget. Nevertheless, like Weiss, he regarded accepting court appointments as part of his duties as an attorney. This Court explained that, in spite of any such limitations, counsel subjected the Commonwealth's case to meaningful adversarial testing, thus negating the applicability of the presumed-prejudice doctrine. *Williams* noted that,

> in *Cronic* itself the United States Supreme Court held that a newly-appointed attorney, who was afforded only twenty-five days to prepare for trial in a case which the government spent four and one-half years investigating and preparing, was not *per se* ineffective. The fact that counsel was a

5. *See also* N.T. Oct. 3, 1994 (voir dire); N.T. Oct. 4, 1994, Vol. I (pretrial motions and objections); N.T. Oct. 4, 1994, Vol. II (voir dire); N.T. Oct. 5, 1994, Vol. II, at 60–65 (pretrial motions and objections); *id.* at 84–88 (opening statement); N.T. Oct. 11, 1994, Vol. VII, at 1094–1102 (guilt-phase closing argument).

6. Weiss conceded Appellant's guilt as to third-degree murder, but strenuously argued, based on the evidence, that guilt was not proven as to first- or second-degree murder, or conspiracy to commit first-degree murder. *See* N.T. Oct. 11, 1994, Vol. VII, at 1096–1101. Appellant does not contend that this tactic constituted *per se* prejudice. *Cf. Cousin,* 585 Pa. at 308, 888 A.2d at 723 (finding no *per se* prejudice where counsel conceded guilt as to voluntary manslaughter in order to gain credibility in the eyes of the fact finder and avoid a conviction for a higher degree of criminal homicide).

young real estate attorney trying his first criminal case, the severity of the criminal charges, the complexity of the matter, and the inaccessibility of witnesses to counsel did not, individually or in combination, provide a basis for concluding that counsel could not render adequate stewardship.

*Id.* at 140, 950 A.2d at 313 (citing *Cronic,* 466 U.S. at 663–66, 104 S.Ct. at 2049–51); *see also Avery v. Alabama,* 308 U.S. 444, 450, 60 S.Ct. 321, 324, 84 L.Ed. 377 (1940) (holding that capital counsel appointed three days before trial were not *per se* ineffective, where they "performed their full duty intelligently and well" and presented the accused's defense at trial); *Com. ex rel. Crosby v. Rundle,* 415 Pa. 81, 87, 202 A.2d 299, 303 (1964) (refusing to presume ineffectiveness where counsel had experience in various areas of the law but had never tried a murder case, and elaborating that "absence of effective representation means representation so lacking in competence that it becomes the duty of court or prosecution to correct it, so as to prevent a mockery of justice"). The *Williams* Court ultimately concluded that "trial counsel's voluntary acceptance of full responsibility for the representation subject to the [fee] limitation does not fall within the narrow category of cases reflecting a breakdown in the adversary process as discussed in *Cronic.*" *Williams,* 597 Pa. at 141, 950 A.2d at 313. Likewise, the Court regarded the $500 limitation on investigative services as a "component of a layered ineffectiveness claim subject to the requirement to prove prejudice." *Id.* The present case, as noted, is substantially similar to *Williams.*

Appellant proffers that *Williams* is distinguishable on the basis that trial counsel there voluntarily accepted the fee, expense, and time limitations, whereas Weiss objected to her appointment due to her lack of experience in trying murder cases. *See* Brief for Appellant at 22. However, Weiss never lodged an objection as of record. According to her PCRA testimony, she had substantial misgivings which she expressed over the phone to Judge Eby when he called to inform her that he wanted her to represent Appellant. In spite of Weiss's uncertainties, Judge Eby expressed confidence in her

and, eventually, entered an order appointing her as Appellant's counsel. As explained, once this occurred, Weiss accepted the assignment on the basis of her belief that it would have been improper for a lawyer to question a court order to this effect. Therefore, Appellant's contention that Weiss "objected" is only true in the colloquial sense that she initially expressed reluctance while speaking with Judge Eby over the phone.[7] This, however, does not constitute a distinction vis-à-vis *Williams* that is legally meaningful for purposes of the presumed prejudice doctrine as it has been developed in *Cronic* and its progeny. To the contrary, the Supreme Court has been generally disinclined to identify new categories of structural error, *accord United States v. White*, 405 F.3d 208, 221–22 (4th Cir.2005), and we believe that Weiss's initial expression of her reservations would not be deemed by that Court to tip the balance significantly in favor of a finding of presumed prejudice.

We are not unsympathetic to the plight of a court-appointed defense attorney laboring under minimal funding and a dearth of relevant experience in a capital case—and even more significantly, to such an attorney's client, who has the most to lose from such a circumstance.[8] Additionally, we do not mean to discount the possibility that an attorney in that situation may ultimately render actual ineffective assistance stemming, at least in part, from her inexperience and the county's funding limitations. Our only point here is that case precedent does not support the finding of structural error under the present circumstances, and hence, claims along such lines need to be proved based upon the three-part *Pierce* test.

7. Appellant has not forwarded a claim of ineffective assistance of counsel based on Weiss's failure to place a formal objection on the record.

8. This author has previously expressed concern regarding alleged systemic deficiencies in the provision of counsel for indigent capital defendants. *See, e.g., Commonwealth v. Jette*, 611 Pa. 166, 190–93, 23 A.3d 1032, 1047–48 (2011) (Saylor, J., concurring); *Commonwealth v. Martin*, 607 Pa. 165, 217, 5 A.3d 177, 208 (2010) (Saylor, J., concurring and dissenting) (citing *Commonwealth v. Ly*, 605 Pa. 261, 989 A.2d 2, 2–5 (2010) (Saylor, J., dissenting)).

■ As regards Appellant's assertion that Weiss would not have met the criteria embodied in Rule 801, Appellant again primarily highlights counsel's lack of experience in handling capital cases. The question of whether counsel's inexperience in such matters, in itself, compels a finding of *per se* prejudice, is addressed above. We do not consider the fact that Rule 801 contains experiential criteria to add substantially to the argument, primarily because the rule went into effect a decade after Appellant's trial. *See* Pa.R.Crim.P. 801, Note (reflecting an effective date of November 1, 2004).

It is true that the character of the interests at stake—a capital defendant's life and liberty—did not change during the intervening ten years. That being the case, it is understandable that Appellant would highlight the Rule's requirements and argue that Weiss did not satisfy them. In considering the legal issue raised, however, the timing of the events is germane. Simply put, Rule 801 does not apply to Appellant's trial since it was meant to be applied prospectively only.[9] The Rule was adopted by an Order of this Court that specified a phase-in schedule for its provisions, *see* Pa.R.Crim.P. 801, Historical Notes, and this Court has confirmed that the Rule was not intended to be applied retroactively. *See Commonwealth v. Boxley*, 596 Pa. 620, 630, 948 A.2d 742, 747 (2008). It follows that, at the time of Appellant's trial, the presumption of competency attaching to defense counsel cannot have been affected by the subsequent adoption of the Rule. *Accord Commonwealth v. Martin*, 607 Pa. 165, 190 n. 17, 5 A.3d 177, 191 n. 17 (2010) ("The mere fact that this Court has recently adopted standards governing the qualifications of defense counsel in capital cases does not mean that appointed counsel in prior cases, who would not qualify under those standards, must have been ineffective."); *Boxley*, 596 Pa. at 630, 948 A.2d at 747 ("Rule 801 in no way suggests that a defendant is automatically entitled to a new trial if his counsel fails to comply with the educational requirements of the rule.").

9. Appellant recognizes that Rule 801 does not govern the present case, but argues that "the self-evident truth of its premise should govern." Brief for Appellant at 12.

Moreover, under the United States Supreme Court's interpretation of the Sixth Amendment right to competent representation, counsel's performance must be judged by the prevailing professional standards in existence at the time of trial. *See Bobby v. Van Hook*, 558 U.S. 4, 6–7, 130 S.Ct. 13, 16–17, 175 L.Ed.2d 255 (2009); *cf. Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").[10] Accordingly, the adoption of Rule 801, with its experiential and educational criteria, ten years after Appellant's trial, does not convince us that we must find a constitutional deprivation without any showing of prejudice.

■ Finally, Appellant contends that prejudice should be presumed under *Cronic* because the ceiling imposed on Weiss's attorney fees created a conflict of interest between Weiss and Appellant. Relying largely on *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), Appellant's theory appears to be that, beyond a certain point, Ms. Weiss would essentially have to work for free, and thus, would incur the opportunity cost of foregoing work on cases for more remunerative clients. This argument seems to represent another approach to claiming structural error due to funding deficiencies. Because, however, the Supreme Court has treated actual conflicts of interest as potentially resulting in presumed prejudice, we will evaluate the claim on its terms.[11]

**10.** Appellant argues that Rule 801 is based on guidelines published by the American Bar Association in 1989, *see* Brief for Appellant at 14, which are not part of the record on appeal. Even if we were to take judicial notice of the ABA's 1989 guidelines, they are not legally controlling as to the adequacy of counsel's representation under the Sixth Amendment. *See Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065; *see also Van Hook*, 558 U.S. at 7, 130 S.Ct. at 16 (observing that the publication of professional standards by private organizations can only "be useful as 'guides' to what reasonable representation entails … to the extent they describe the professional norms prevailing when the representation took place"). Therefore, such guidelines cannot form the sole basis of a conclusion that prejudice must be presumed.

**11.** The Commonwealth argues that this claim is waived. Our own review reveals that it was presented to the PCRA court, *see, e.g.,*

■ The Supreme Court has found a constructive denial of the constitutional right to the assistance of non-conflicted counsel where a lawyer is required, over objection, to undertake simultaneous representation of two co-defendants with antagonistic defenses. *See Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). After *Holloway*, the Court clarified that multiple representation, in itself, does not give rise to presumed denial of counsel. Rather, the burden remains on the defendant to demonstrate that the asserted conflict adversely affected his lawyer's performance. *See Sullivan*, 446 U.S. at 348, 100 S.Ct. at 1718; *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067; *accord Mickens v. Taylor*, 535 U.S. 162, 174, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002); *Smith v. Robbins*, 528 U.S. 259, 287, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000); *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987); *Commonwealth v. Small*, 602 Pa. 425, 448–49, 980 A.2d 549, 563 (2009).[12]

The primary difficulty with Appellant's conflict-of-interest-based *per-se* prejudice claim is that the conflict-of-interest framework, as it has been developed for purposes of *Cronic*-style presumed prejudice in the *Holloway/Sullivan* line of cases, pertains only to dual representation, that is, representation of more than one client, where the clients have diverging interests. *See, e.g., Commonwealth v. Tedford*, 598 Pa. 639, 728, 960 A.2d 1, 54 (2008) ("An actual conflict of interest is

"Second Supplemental Exhibits and Averments to Petition for Habeas Corpus Relief," at 3 ¶ 3; "Brief in Support of Petitioner's Amended Petition and in Response to the Brief of the Commonwealth," at 87–92, albeit that court did not discuss it in its opinion denying guilt-phase relief.

12. The burden of showing an adverse effect in such matters is not equivalent to the requirement of showing prejudice in a claim dealing with actual ineffectiveness—*i.e.,* where the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *see Sullivan*, 446 U.S. at 349–50, 100 S.Ct. at 1719 (stating that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief")—but some showing must be made that the conflict in question had an adverse effect on counsel's performance.

evidenced whenever during the course of representation, the interests of appellant—and the interests of another client towards whom counsel bears obligations—diverge with respect to a material factual or legal issue or to a course of action." (internal quotation marks omitted)). The Supreme Court has characterized these situations as subsuming an "active representation" of conflicting interests, *see, e.g., Mickens,* 535 U.S. at 166, 122 S.Ct. at 1241 (reciting that the Court has foregone inquiry into actual prejudice where "the defendant's attorney actively represented conflicting interests"), which it has recognized as being inherently suspect. *See id.* at 168, 122 S.Ct. at 1241 (quoting *Holloway,* 435 U.S. at 489–90, 98 S.Ct. at 1181). In this respect, *i.e.,* in focusing on the "active" nature of the conflict, the Court's concern centers primarily on the potential for an attorney to alter his trial strategy due to extrinsic considerations stemming from other loyalties, thereby distorting counsel's strategic or tactical decisions in a manner that would not occur if counsel's sole loyalty were to the defendant. *See, e.g., Wood v. Georgia,* 450 U.S. 261, 272, 101 S.Ct. 1097, 1103–04, 67 L.Ed.2d 220 (1981) (remanding for a determination of adverse effect where the Supreme Court could not be certain whether the defense attorney was "influenced in his basic strategic decisions by the interests of the employer who hired him"). In this vein, courts sometimes assess adverse effect by questioning whether the record shows that counsel "pulled his punches," *i.e.,* failed to represent the defendant as vigorously as he might have done had there been no conflict. *See, e.g., United States v. Nicholson,* 475 F.3d 241, 251 (4th Cir.2007); *United States v. Martinez,* 630 F.2d 361, 362–63 (5th Cir.1980); *People v. Clark,* 52 Cal.4th 856, 131 Cal. Rptr.3d 225, 261 P.3d 243, 344 (2011); *Beard v. Commonwealth,* 302 S.W.3d 643, 647 (Ky.2010); *Davis v. State,* 897 So.2d 960, 970 (Miss.2004). Here, however, Appellant is arguing for assumed prejudice on the theory that Weiss's representation of Appellant conflicted with her own interest in obtaining monetary compensation from work she could otherwise have performed for other clients. Appellant has thus shifted the focus to the attorney's private interests as the basis for the conflict—and hence, presumed prejudice—as

opposed to centering her contention on the difficulties that arise when an attorney attempts to represent multiple parties with diverging interests.

We do not foreclose the possibility that a conflict of interest may arise apart from dual representation—such as where an attorney is somehow beholden to the interests of another, antagonistic party without actually functioning as that party's attorney. *Cf. Goforth v. Commonwealth,* 2009 WL 1110400, *8 (Ky. April 23, 2009) (considering, albeit ultimately rejecting, a defendant's allegation of a conflict of interest where his attorney was paid by the same entity that provided counsel for his co-defendant). Nor do we deny that an attorney's financial interests can conflict with those of his client under some circumstances, *see, e.g., In re Vioxx Prods. Liab. Litig.,* 650 F.Supp.2d 549, 560 (E.D.La.2009) (positing that, in a civil lawsuit where the amount of a contingency fee is at issue, a conflict may exist between the claimant and his attorney who both seek to maximize their own percentage of an award), or that a conflict with the attorney's private interests may adversely affect the attorney's representation of his client, such as where defense counsel is himself under criminal investigation. *See Thompkins v. Cohen,* 965 F.2d 330, 332 (7th Cir. 1992) (noting that a conflict may arise in such a circumstance since counsel may fear that an acquittal will anger the district attorney's office, which might then retaliate); *see also United States v. Fulton,* 5 F.3d 605, 610 (2d Cir.1993) (finding a conflict of interest where a government witness alleged that counsel engaged in criminal conduct related to the charges for which the defendant was on trial); *United States v. Ellison,* 798 F.2d 1102, 1106–08 (7th Cir.1986) (finding a conflict where pursuit of the client's interests would lead to evidence of counsel's malpractice). Thus, we credit Appellant's argument to the degree it proposes that it is possible for an underpaid attorney's financial interest in undertaking other, more remunerative work, to impinge on his or her full devotion to the interests of the client at issue—at least in the sense that the attorney may be incentivized to spend less time and fewer resources representing that client as a result of such extrinsic

financial pressures. *See generally Fulton*, 5 F.3d at 609 ("A situation in which the attorney's own interests diverge from those of the client presents the same core problem presented in the multiple representation cases: the attorney's fealty to the client is compromised.").[13]

In spite of the above, we remain doubtful that the asserted conflict here can reasonably fit within the contours of the conflict-of-interest framework for Sixth–Amendment presumptive prejudice, at least as the Supreme Court has developed that doctrine, as it is of a different nature qualitatively from the other conflicts that the Court has recognized. In this regard, we are guided by the Supreme Court's own analysis of its *Holloway/Sullivan* line, in which it has criticized a tendency among the lower federal courts to apply *Sullivan* "unblinkingly to all kinds of alleged attorney ethical conflicts." *Mickens*, 535 U.S. at 174, 122 S.Ct. at 1245 (internal quotation marks and citation omitted). Even more pointedly, the *Mickens* Court explained that such tribunals

> have invoked the *Sullivan* standard not only when (as here) there is a conflict rooted in counsel's obligations to former clients, but *even when representation of the defendant somehow implicates counsel's personal or financial interests*, including a book deal, a job with the prosecutor's office, the teaching of classes to Internal Revenue Service agents, a romantic "entanglement" with the prosecutor, or fear of antagonizing the trial judge.

It must be said, however, that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application. "[U]ntil," it said, "a defendant shows that his counsel actively represented conflicting inter-

13. As a factual matter, there is little evidence of record to suggest that the fee cap resulted in an actual conflict. While it may be true, as Appellant stresses, that the $5,000 ceiling resulted in a low hourly rate when compared with Weiss's other legal work, Weiss acknowledged that she was paid for her services, *see* N.T., Nov. 21, 2006, at 18–19, and when asked directly whether she believed that her appointment presented her with a conflict of interest, she responded in the negative, stating, "I didn't give it a thought. I was Court Ordered to represent Carolyn King, and I did so." *Id.* at 77.

ests, he has not established the constitutional predicate for his claim of ineffective assistance."

*Id.* at 174–75, 122 S.Ct. at 1245 (quoting *Sullivan,* 446 U.S. at 350, 100 S.Ct. at 1719) (emphasis altered; citations omitted). Thus, because *Mickens* expressly disapproved extending the *Holloway/Sullivan* conflict analysis to a broad category that it couched in terms of "counsel's personal or financial interests," we are not at liberty, absent further material guidance from that Court, to apply *Sullivan* so as to find structural error grounded on the fee ceiling imposed by the county court in the present case. Accordingly, Appellant cannot prevail on her claim that she was constructively denied counsel due to the asserted conflict grounded on Weiss's financial interest in working on cases for more remunerative clients during the relevant time period.

 Appellant next claims that she is entitled to a new trial because counsel was ineffective in failing to present expert psychiatric or other mental health testimony to support the defenses of duress and diminished capacity. Addressing the duress issue first, Appellant contends that Weiss initially intended to present the affirmative defense of duress, *see infra* note 14, which would have absolved Appellant of all criminal liability for killing Goodman, *see Commonwealth v. Markman,* 591 Pa. 249, 284, 916 A.2d 586, 607 (2007) ("Duress is a defense to criminal culpability."), but that she ultimately opted not to pursue that defense, as is evident from the fact that Weiss never asked the jury to acquit King of criminal homicide. Appellant suggests that this was a critical mistake, since Weiss was aware of Appellant's history of physical and sexual abuse, and that the introduction of expert mental health testimony could have persuaded the jury to find that Appellant acted under duress. In this latter regard, Appellant highlights a passage from the PCRA testimony of Dr. Harry Krop, a licensed psychologist, which Appellant states "could have assisted the lay jury in understanding how the perpetration of sexual and physical abuse upon [Appellant] by the males in her life ... could have left her susceptible to coercion by Martin[.]" Brief for Appellant at 25.

The difficulty with Appellant's argument is that, although Dr. Krop discussed Appellant's history of sexual abuse and the possibility that she was suffering from post-traumatic stress disorder, depression, and/or low self-esteem at the time of the killing, he clarified that this resulted in an emotional dependency upon Martin and a concomitant fear of abandonment. There is no indication in the portion of Dr. Krop's testimony on which Appellant relies that he concluded that Appellant was coerced by the use or threat of force.[14] To the contrary, Appellant quotes Dr. Krop as stating:

So I don't think [Appellant] was afraid that [Martin] would hurt her in a physical kind of way. I think she was just so devastated by the possibility of being rejected and abandoned and not pleasing this man that that to me was probably the most important aspect of this pathological relationship that she had with this individual.

N.T., Feb. 23, 2009, at 86, *quoted in* Brief for Appellant at 26; *see also id.* at 102 (reflecting Dr. Krop's testimony that Appellant "feared rejection" but was not "physically afraid" of Martin); *id.* at 84 ("I don't think she was physically afraid of Mr. Martin.").[15] Even if we grant, *arguendo*, that fear of rejection or of not pleasing one's intimate companion constitutes an incentive to engage in criminal conduct, it cannot reasonably be equated with the use or threat of unlawful force against Appellant's person for purposes of Section 309(a) of the Crimes Code. Thus, the evidence brought forward at the PCRA hearing simply does not implicate a defense under

14. The Crimes Code defines duress in terms of physical coercion:
(a) **General Rule.**—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
18 Pa.C.S. § 309(a).

15. Although Appellant also refers to another defense expert, Neil H. Blumberg, M.D., *see* Brief for Appellant at 25, Dr. Blumberg's assessment was largely aligned with that of Dr. Krop. *See, e.g.*, N.T., Feb. 24, 2009, at 138 (reflecting Dr. Blumberg's conclusion that Appellant was not subject to any actual or threatened coercion by Martin, although she was enamored with him and therefore was willing to comply with his directives in order to continue her relationship with him).

Section 309(a). Because Appellant's underlying legal issue lacks arguable merit, her ineffectiveness claim based on Weiss's failure to pursue the defense of duress is unavailing. *See Commonwealth v. Walker*, 613 Pa. 601, 611–12, 36 A.3d 1, 7 (2011) (observing that an ineffectiveness claim may be denied upon showing that any one of the three prongs is not satisfied).

■■■■■■ Turning to the portion of Appellant's ineffectiveness claim based on a foregone defense of diminished capacity, we note initially that, under this Court's prevailing precedent, such a defense to first-degree murder is only available to defendants who admit that they killed the victim, but contest the degree of guilt based on an inability, at the time of the offense, to formulate a specific intent to kill due to a mental defect or voluntary intoxication. *See Commonwealth v. Hutchinson*, 611 Pa. 280, 340–42, 25 A.3d 277, 312 (2011); *Commonwealth v. Rainey*, 593 Pa. 67, 103, 928 A.2d 215, 237 (2007); *Commonwealth v. Laird*, 555 Pa. 629, 645, 726 A.2d 346, 353 (1999).[16] As applied here, Appellant admitted at trial that she assisted Martin in binding Goodman and carrying him to the basement, where he died of asphyxiation due to the coverings that had been secured over his head. She also admitted that she handed Martin the roll of duct tape on several occasions while he was binding Goodman and placing the tape around the items that covered Goodman's head, depriving him of oxygen. Finally, she stated in her recorded confession (which was played for the jury and endorsed *in toto* by Appellant at trial) that she procured one such bag for Martin to place over Goodman's head after Goodman had been disabled. She testified, however, that, although she performed these actions, she did not want or intend for Goodman

---

**16.** This author has, on more than one occasion, indicated a willingness to reconsider the restrictions upon alternative defenses where arguments based on the theoretical underpinnings are advanced. *See Commonwealth v. Gibson*, 597 Pa. 402, 439 n. 17, 951 A.2d 1110, 1132 n. 17 (2008); *Commonwealth v. Spotz*, 587 Pa. 1, 108, 896 A.2d 1191, 1255 (2006) (Saylor, J., concurring and dissenting). Issues concerning such restrictions are not presently in sharp relief because we conclude that diminished capacity was a cognizable defense at the guilt phase of Appellant's trial.

to die. *See* N.T., Oct. 11, 1994, Vol. VII, at 1017–18, 1026–35; Exh. 132A at 12. In the defense's closing argument, moreover, Weiss conceded Appellant's guilt to third-degree murder, but attempted to persuade the jury that first-degree murder had not been proved. *See supra* note 6. Under these circumstances, we conclude as a threshold matter that evidence of diminished capacity would have been admissible at Appellant's trial.

 Nevertheless, to support a diminished capacity defense, Appellant would have had to present "extensive psychiatric testimony establishing [that she] suffered from one or more mental disorders which prevented [her] from formulating the specific intent to kill." *Commonwealth v. Cuevas*, 574 Pa. 409, 418, 832 A.2d 388, 393 (2003). Appellant alludes to having suffered from post-traumatic stress disorder as a result of her history of being the victim of sexual abuse and domestic violence. *See* Brief for Appellant at 29. While those circumstances are unfortunate, Appellant does not explain how they could have interfered with her ability to form a specific intent to kill, nor does she identify any witness who might have been helpful in making such a connection or in otherwise establishing a diminished capacity defense. Furthermore, our own review of the PCRA record does not reveal any expert testimony suggesting that Appellant's mental and emotional difficulties stemming from her dysfunctional childhood resulted in an inability to form a specific intent to kill. Thus, Appellant has not demonstrated that any evidence existed at the time of trial that could have supported a defense to first-degree murder based on diminished capacity.[17] Her ineffectiveness

17. As for a potential intoxication-based diminished capacity defense, Appellant refers to the psychiatrist who evaluated her for competency to stand trial, and alleges that that individual informed Weiss that Appellant had reported drug and alcohol use at the time of the offense. *See* Brief for Appellant at 29. However, Appellant's PCRA mental-health experts both opined that, even if Appellant was somewhat intoxicated when the incident occurred, her intoxication did not overwhelm her sensibilities. *See* N.T., Feb. 23, 2009, at 169 (reflecting Dr. Krop's opinion that Appellant was not "so intoxicated that she didn't know what she was doing"); N.T., Feb. 24, 2009, at 108 (reflecting similar testimony by Dr. Blumberg); *cf. Commonwealth v. Blakeney*, 596 Pa.

claim must therefore fail. *See Commonwealth v. Lee,* 541 Pa. 260, 276, 662 A.2d 645, 654 (1995) (reciting that, to prevail on an ineffectiveness claim based on counsel's failure to call a witness, the claimant must demonstrate, *inter alia,* that the witness's testimony would have been beneficial or helpful in establishing the asserted defense).

Appellant next contends that Weiss was ineffective based on seven distinct aspects of the trial to which counsel failed to object. Six of these pertain to trial testimony that Appellant alleges was improper, and one relates to the consolidation of charges. All of these claims raise underlying issues that were addressed on the merits in Appellant's direct appeal. Nevertheless, they are not subject to the PCRA's previous-litigation bar because they are distinct ineffectiveness claims derivative of the underlying issues. This Court has recognized that, while such ineffectiveness claims may fail for the same reason that the underlying issues faltered on direct review, the Sixth Amendment basis for an allegation of counsel ineffectiveness gives rise to a separate claim for review under the PCRA. *See Commonwealth v. Carson,* 590 Pa. 501, 526, 913 A.2d 220, 234 (2006); *see also Commonwealth v. Collins,* 585 Pa. 45, 61, 888 A.2d 564, 573 (2005) (holding that derivative ineffectiveness claims are distinct Sixth Amendment claims, albeit they "may fail on the arguable merit or prejudice prong for the reasons discussed on direct appeal"); *cf. Williams,* 597 Pa. at 142, 950 A.2d at 313–14 ("While under the *Collins* decision, layered ineffectiveness claims are distinct from the underlying claims, the underlying claims remain an essential component, and it should now go without saying that those challenging a verdict must attend to all aspects of their claims for relief." (citing *Collins,* 585 Pa. at 60–61, 888 A.2d at 573)).

510, 524, 946 A.2d 645, 653 (2008) (observing that evidence of intoxication may only be offered to reduce murder from a higher degree to a lower degree pursuant to Section 308 of the Crimes Code if it shows that the defendant was overwhelmed to the point of losing her faculties and sensibilities). Thus, Appellant has not identified any evidence that could have supported a successful diminished capacity defense based on voluntary intoxication at the time of the incident.

■ First, Appellant criticizes Weiss for failing to object to evidence that Appellant had applied for government housing assistance using a form that revealed she was married to someone other than Martin. Appellant's theory is that this form was irrelevant to the issue of guilt or innocence, and it "stereotyped this indigent African American woman as a promiscuous person who lived off the public dole." Brief for Appellant at 33. In this same claim, Appellant complains of counsel's failure to object to evidence showing that she checked into a motel under the name of "Anna" King. During Appellant's direct appeal this Court affirmatively held that these items of evidence were properly introduced at trial. *See King*, 554 Pa. at 355–56, 721 A.2d at 775 (finding that Appellant's signature on the government form was appropriately used as a handwriting exemplar to compare to the signatures on the checks drawn on Goodman's account, and that testimony concerning the use of the name "Anna" King when checking into a motel near the prison was probative of Appellant's knowledge that Martin would be improperly absent from prison and of her desire to facilitate his escape). That being the case, counsel cannot have been ineffective for failing to object to their admission. *See Commonwealth v. Paddy*, 609 Pa. 272, 317, 15 A.3d 431, 458 (2011) (indicating that where evidence is properly introduced at trial, a derivative claim of ineffective assistance of counsel for failing to object to such evidence cannot succeed).

■ Second, Appellant contends that counsel was ineffective for failing to object to certain aspects of the trial testimony referencing Appellant's use or possession of marijuana, and failing to request a cautionary instruction in connection with such references.[18] She states that the drug references were "irrelevant, inflammatory, and prejudicial," and that they "served to portray [Appellant] as a drug-crazed woman lack-

18. As part of this claim, Appellant also asserts that counsel "solicited the introduction" of Appellant's drug use, and highlights a portion of the trial transcript in which Weiss was cross-examining one of Appellant's co-workers. Notably, however, counsel's question concerning whether Appellant purchased drugs from the witness was answered in the negative. *See* N.T., Oct. 6, 1994, Vol. III, at 372.

ing any regard for the law." Brief for Appellant at 34, 37. This Court considered these same facets of the trial testimony during Appellant's direct appeal and ultimately determined that the complained-of drug references "occurred infrequently and were innocuous in the context of the overall trial." *King*, 554 Pa. at 350, 721 A.2d at 772. Thus, even if we were to assume, *arguendo*, that counsel lacked a reasonable basis for failing to object or request cautionary instructions, the drug references are insufficient to undermine confidence in the outcome of the proceeding. *See Williams*, 597 Pa. at 142, 950 A.2d at 314 (finding that the litigant's ineffectiveness claim was undermined, and that relief was not due, where the litigant failed to address this Court's determination on direct appeal that prejudice had not been shown relative to the underlying claim).

Third, Appellant maintains that counsel was ineffective for failing to object to the Commonwealth's introduction of certain additional testimony that Appellant considers irrelevant, improper, and inflammatory. This evidence subsumes Appellant's own testimony on cross-examination, which included her admission that she was legally married to Carl William King rather than Bradley Martin, as well as testimony elicited by the Commonwealth in its rebuttal case, including that of a corrections officer who expressed her view that Appellant was a leader among her fellow inmates, and stated that she overheard Appellant indicate that if Martin pled guilty, Appellant would only receive a two-year sentence. This claim parallels an argument that was rejected on direct appeal. Addressing the same proofs, this Court explained that

the testimony of King elicited by the Commonwealth on cross-examination, as well as the testimony of the witnesses called to rebut King, was not improper. During King's direct examination, defense counsel played King's tape-recorded statement to the Lebanon County detectives [in which] King had asserted that she was married to Martin and that he was the father of her son. Therefore, it was proper for the Commonwealth to impeach King's credibility on cross-examination by questioning her concerning the fact

that she was legally married to Carl William King, who was listed on her son's birth certificate as the child's father. Several of the Commonwealth's rebuttal witnesses also testified to this fact. Additionally, King challenges the testimony of a prison guard concerning King's reputation as an outspoken leader and King's alleged comments concerning the sentence she would receive if Martin pled guilty. Such testimony was a relevant and appropriate rebuttal of King's defense, in which she had portrayed herself as a passive companion who had been coerced into participating in the robbery and murder.

*King*, 554 Pa. at 356–57, 721 A.2d at 775–76. Again, since this testimony was properly admitted, counsel cannot have been ineffective for failing to object to its admission.

 Fourth, Appellant claims that both the trial court and the Commonwealth improperly vouched for the credibility of prosecution witness Barbara Charles by pointing out that she was the wife of the prosecuting attorney. Appellant emphasizes that vouching for a witness's veracity is improper because it places the prestige of the government behind the witness through personal assurances that the witness is believable, and it indicates that information unknown to the jury supports the witness's testimony. *See Unites States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985); *see also Commonwealth v. Cousar*, 593 Pa. 204, 232, 928 A.2d 1025, 1041 (2007) ("Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record.").

There is no indication in any of the portions of the record to which Appellant refers that the trial court or the prosecutor sought to assure the jury that Mrs. Charles was more believable than any other witness based on information known to the court or the Commonwealth, or based on the fact of her marriage to the prosecutor. Notably, when Appellant complained about these same aspects of the trial on direct appeal, this Court concluded that "the comments made by the trial

court and the prosecutor concerning the fact that Mrs. Charles happened to be the district attorney's wife were merely passing references that were not seized upon by the Commonwealth in order to bolster her veracity." *King*, 554 Pa. at 356, 721 A.2d at 775. Since the references to Mrs. Charles being married to the prosecutor were not utilized to vouch for Mrs. Charles' credibility, Appellant's underlying issue lacks arguable merit.

Fifth, Appellant asserts that counsel was ineffective because she failed to object to the trial court's decision to consolidate for trial the charges against her relating to murder and escape or conspiracy to commit escape. When this Court considered the same underlying issue during Appellant's direct appeal, it held that the trial court had acted within its discretion in consolidating the charges for trial. *See King*, 554 Pa. at 349–50, 721 A.2d at 772. Since the trial court acted appropriately, counsel's failure to object could not have deprived Appellant of her constitutional right to effective representation.

Sixth, Appellant complains that evidence of Martin's uncharged prison visitation-release and work-release violations was admitted at trial. She states that counsel was ineffective for failing to object to such evidence, which, she suggests, resulted in prejudice "because of the taint of her association with Martin and the fact that she was charged with escape in connection with Martin's violation of his prison-release privileges[.]" Brief for Appellant at 44. Although Appellant fails to specify the particular evidence she views as prejudicial, she appears to be referring to proofs concerning Martin's visits with Goodman while on a work-release pass. Here again, however, during Appellant's direct appeal this Court found that such proofs were introduced at trial for a legitimate purpose, namely, to establish that there was a relationship between Martin and Goodman prior to the murder, and that an appropriate cautionary instruction was given. *See King*, 554 Pa. at 349–50, 721 A.2d at 772. Therefore, to the degree this is the evidence that Appellant is seeking to portray as improper, her underlying claim of trial error lacks arguable merit.

■ Seventh, Appellant claims that counsel was ineffective for failing to object to the introduction of testimony regarding Goodman's personal characteristics. She states that testimony regarding such personal qualities may only be admitted if relevant to an issue at trial. In particular, Appellant contends that counsel erred in failing to object to Goodman's "testimony from beyond the grave, read into the record by Detective Radwanski," as well as "victim impact testimony provided by [Goodman]'s daughter . . . and *Lebanon Daily News* photographer James Zengerle." Brief for Appellant at 45. Appellant appears to be referring to certain evidence that was brought to this Court's attention on direct appeal. Concerning such proofs, this Court expressed that

> all of the challenged evidence was relevant to issues that were before the jury. Given that there were no signs of forced entry into Mr. Goodman's home, the inference arose that the murder had been committed by someone who was acquainted with him and either had his own key or had been voluntarily admitted. Thus, the letter [written by Goodman and read by Detective Radwanski] was properly admitted to establish that Martin had a prior relationship with Goodman.
>
> The testimony of the daughter was probative of the fact that Goodman resided alone. Finally, the photographs and accompanying testimony of the photographer were relevant because the pictures depicted the vase that Martin used to strike Goodman, as well as a hutch from which, according to the testimony of Goodman's daughter, the defendants could have obtained the duct tape that they used to bind Goodman. Moreover, the trial court did not abuse its discretion in determining that the potential prejudice about which Appellants complain, namely the effect of sympathetic glimpses of Goodman's character and life which the jury could have gleaned from the evidence, was outweighed by the probative value of these proofs.

*King*, 554 Pa. at 352–53, 721 A.2d at 773–74. Accordingly, this Court has held that all of the evidence of which Appellant presently complains was properly admitted at trial. That

being the case, Appellant's ineffectiveness claim based on counsel's failure to object to this evidence cannot afford her a basis for relief.

■ Appellant next maintains that Weiss was ineffective because she failed to challenge the manner by which Lebanon County selected its jurors, which was allegedly based on a per capita tax roll. Appellant argues that the jury selection process denied her a fair cross-section of the community in violation of the Sixth Amendment because "the elderly, the disabled, and women who are housewives" are exempt from paying these taxes. Brief for Appellant at 47. She additionally contends that the jury selection process contravened Section 4501(3) of the Judicial Code, which states that citizens "shall not be excluded from service as a juror on the basis of race, color, religion, sex, national origin or economic status." 42 Pa.C.S. § 4501(3).

A majority of this Court recently rejected a virtually identical claim raised by Appellant's codefendant Martin in his appeal from the denial of guilt-phase relief on collateral review. In his claim, Martin had challenged the exclusion from the venire of individuals over 65, housewives, and persons making less than $5,000 per year, as those individuals are exempt from paying per capita taxes. This Court concluded that Martin had failed to make out a *prima facie* case that he was denied a jury selected from a fair cross-section of the community. We observed as a general matter that Martin was required, first, to demonstrate the arguable merit of the underlying claim—*i.e.,* that the method of jury selection was improper as violating the Constitution's fair-cross-section requirement. To do so, he would have to show that: (1) the group allegedly excluded is a distinctive group in the community; (2) representation of this group in the pool from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the under-representation is due to systematic exclusion of the group in the jury-selection process. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Martin,* 607 Pa. at 194, 5 A.3d at 194. However, this Court determined

that Martin failed to satisfy this standard because he simply asserted that the above groups were disproportionately excluded, but did not allege how their absence was unfair or unreasonable compared to the number of those individuals in the community. Additionally, Martin omitted to offer any argumentation regarding how the alleged underrepresentation was due to a systematic exclusion of the groups during the jury selection process. *See Martin*, 607 Pa. at 194–95, 5 A.3d at 194.[19]

Likewise, here, Appellant does not make out a *prima facie* case that she was denied a jury selected from a fair cross-section of the community. For example, while Appellant alleges that certain groups were excluded from the venire panel, she fails to explain how such groups are constitutionally "distinctive," how their representation was unfair and unreasonable in relation to the number of such persons in the community as a whole, or how the alleged underrepresentation was due to systematic exclusion.

More fundamentally, it is not clear that such groups were, in fact, excluded from jury service. Appellant alleged in her pleadings that Lebanon County utilized its per capita tax rolls to determine jury service eligibility as of the date of her trial. She clarified, however, that she was uncertain whether the exemptions from tax liability had any effect on the list of prospective jurors drawn from those rolls. She indicated that the matter was subject to ongoing investigation by counsel and that "Petitioner will supplement this claim as necessary based upon the results of that investigation." Preliminary Amended Petition for Habeas Corpus Relief, at 124 n. 47. In her supplemental pleadings, however, Appellant did not revisit the issue or otherwise clarify how the tax rolls were used. Moreover, Appellant did not adduce any evidence in support of this claim at the hearing, the scope of which does not appear to have been limited by the PCRA court. Furthermore, in

19. Although the *Martin* Court was somewhat fractured, this part of the lead opinion represented the view of at least four of the six participating Justices.

addressing the question in its opinion denying guilt-phase relief to Martin, the common pleas court stated:

> In point of fact, the per capita tax roll is, to this Court's knowledge, the most inclusive general compilation of citizens of this county available. It is certainly far more inclusive than voter registration lists and/or motor vehicle license registration lists.
>
> Interestingly, the per capita tax roll, by its definition, would include all of those individuals whose names appear on voter registration lists and/or motor vehicle registration lists.... While exclusions may be made by individual taxing districts ... for individuals of a certain age group or income status, *there are no exclusions from the listing from which jury panels are randomly selected by computer.*

*Commonwealth v. Martin,* Nos. 1993–10899, 1993–11079, *slip op.* at 43 (C.P.Lebanon, January 3, 2002) (emphasis added), *reproduced in* Commonwealth's Motion to Dismiss, at Exh. 2. Thus, Appellant's admission that an overarching factual issue subsisted relative to this claim was subsequently confirmed by the common pleas court in disposing of Martin's PCRA petition. As noted, Appellant alleged that the question was subject to continued investigation by counsel, but she did not ultimately resolve the issue. On this basis as well, we conclude that she failed to make out a *prima facie* case of constitutional error under *Duren v. Missouri.*[20]

▮ Appellant next contends that trial counsel was ineffective for failing to challenge the presence of six "ghost jurors" empanelled on her jury, three of whom, she contends, did not appear on the Lebanon County juror rolls for October 1994, and three of whom did not appear on the 1994 jury list at all. Appellant references this author's responsive expression in *Martin* for the position that allegations of irregularity in jury selection implicate the trial's structural integrity. *See* Brief

---

**20.** Appellant also cites to three provisions of the Pennsylvania Constitution, *see* Brief for Appellant at 47 (citing Pa. Const. art. I, §§ 1, 26, 28), but she does not develop her claim under the state charter in any particularized fashion.

for Appellant at 49 (citing *Martin*, 607 Pa. at 217–18, 5 A.3d at 208–09 (Saylor, J., concurring and dissenting)).

In her PCRA petition, Appellant did not supply names or other proofs concerning the six jurors in question, noting her intention to supplement the petition with further information at a later date. *See* Preliminary Amended Petition for Habeas Corpus Relief, at 125 & n. 48. As with the prior claim, she did not return to the issue in subsequent pleadings, nor did she proffer evidence to support the claim at the PCRA hearing. It does not appear that Appellant was precluded from developing this claim at the hearing, or that she requested an extension of time to do so.[21] In its opinion, moreover, the PCRA court observed that no record evidence existed to support the contention. *See King*, No. CP–38–CR–10898–1993, *slip op.* at 54. Thus, Appellant has not demonstrated that her underlying issue has arguable merit.[22]

Finally, Appellant indicates that she is entitled to a new trial due to the cumulative effect of the guilt-phase errors she identifies above. In *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523 (2009), this Court recited the general rule that no amount of failed ineffectiveness claims may collectively attain merit if they could not do so individually, *see id.* at 344, 966 A.2d at 532; *accord Commonwealth v. Laird*, 605 Pa. 137, 186, 988 A.2d 618, 647 (2010), but clarified that, where multiple guilt-phase errors are "intertwined"—for example, where they

21. Although Appellant now provides six juror names which she asserts did not appear on the appropriate 1994 jury list, *see* Brief for Appellant at 48 n. 10, this cannot substitute for credited evidence of record or findings made by the PCRA court to the effect that these individuals were improperly empanelled on Appellant's jury.

22. Appellant's reference to *Martin* is unavailing, particularly as *Martin* is materially distinguishable from the present case: although the PCRA court held an evidentiary hearing in that matter, it was limited in scope so as to exclude evidence relating to the ghost juror issue. *See Commonwealth v. Martin*, Nos. 1993–10899, 1993–11079, *slip op.* at 11–14 (C.P.Lebanon, Jan. 3, 2002). Here, as noted, there is no basis to believe that Appellant was precluded from adducing evidence to support her claim before the PCRA court. Hence, a remand for that purpose would be unwarranted even if the responsive expression to which Appellant cites had represented the view of a majority of Justices within the context of that dispute.

relate to various components of a single defense to criminal culpability—they may be considered together. *See Johnson,* 600 Pa. at 344–45, 966 A.2d at 532. Further, "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Id.* at 345, 966 A.2d at 532 (citing *Commonwealth v. Perry,* 537 Pa. 385, 393, 644 A.2d 705, 709 (1994) (finding that multiple instances of ineffectiveness, "in combination," prejudiced the defendant)).

The only claim for which we have assumed, for the sake of decision, that counsel provided deficient stewardship pertains to Weiss's failure to object to the references at trial to Appellant's drug use. We have also expressed our view that the funding limitations under which Weiss labored amounted to a troubling circumstance although they did not result in structural error. Still, we do not find these aspects of the trial, even when considered together, sufficient to undermine our confidence in the outcome of the guilt phase. It bears noting that Appellant made a full confession to having participated in all of the material actions that caused Goodman's death, with the sole exception that Martin alone struck Goodman over the head with a vase. However, Appellant: helped Martin bind Goodman by providing him with wires and string for that purpose; procured a plastic bag to place over Goodman's head; and handed Martin duct tape with which to seal the bag and further disable Goodman from moving. She also helped Martin carry Goodman into the basement where he was wrapped in a bedspread and left to suffocate without the ability to seek outside help. These facets of Appellant's confession were contained on a police audiotape that was played for the jury, and Appellant testified that everything on the tape was true.[23] She also stated that, in spite of her actions, she did not intend to kill Goodman, albeit the jury evidently disbelieved her. Under such circumstances, notwithstanding the prejudice that Appellant may have suffered

23. The substance and many of the details of Appellant's taped confession were corroborated by the testimony of an FBI agent to whom Appellant confessed shortly after her arrest in Arizona. *See* N.T. Oct. 8, 1994, Vol. V, at 714–23.

as a result of being represented by underpaid counsel who neglected to object to several drug references or request cautionary instructions, we do not believe that, apart these deficiencies, there is a reasonable probability that the outcome of the guilt phase would have been different.

Accordingly, because none of the issues Appellant raises entitles her to a new trial, the order of the Court of Common Pleas is affirmed.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a special concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the thorough Majority Opinion, subject to the following reservations concerning appellant's sub-claim premised upon a novel conflict of interest theory purportedly sounding under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Appellant's theory posits that court-appointed trial counsel labored under an actual conflict of interest due to the allegedly low-capped fee paid to counsel at the time of trial in 1994; the fact of the supposedly inadequate fee alone, appellant says, is enough to prove the actual conflict, thus sparing appellant the necessity of proving either actual deficient performance by counsel or resulting prejudice. Appellant cites no controlling case from this Court or from the U.S. Supreme Court—for there are none—that holds, or even suggests, that a cognizable Sixth Amendment conflict of interest, establishing an entitlement to *Cronic/Sullivan* relief, can arise solely from the level of remuneration provided to court-appointed counsel.

The Majority accurately notes that appellant's theory seems to seek recognition of yet another species of structural error (in a brief where multiple broadly-framed theories overlap), and evaluates the theory on its merits because the U.S. Supreme Court has treated actual conflicts of interest as potentially resulting in prejudice. In the course of its analysis, the Majority notes that it "credits" appellant's argument "to the degree it proposes that it is possible for an underpaid attorney's financial interest in undertaking other, more remunerative work, to impinge on his or her full devotion to the interests of the client at issue—at least in the sense that the attorney may be incentivized to spend less time and fewer resources representing the client as a result of such extrinsic financial pressures." The Majority then provides an extensive discussion of appellant's novel conflict theory in the context of governing law from the High Court, ultimately holding that the theory must fail because, *inter alia*, the Court has made clear that alleged conflicts arising from counsel's "personal or financial interests" cannot form the basis for a claim under *Sullivan*. *See* Majority Op. at 420–27, 57 A.3d at 618–21.

I write separately only to express my personal and perhaps greater skepticism concerning appellant's novel theory where, as here, it is offered in a collateral attack upon counsel as a basis for "automatic reversal." Brief for Appellant at 14, 21. In my recent Concurring Statement in *Commonwealth v. Lopez*, 51 A.3d 195, 196–201 (Pa.2012), I addressed a different, but no less novel, claim of attorney conflict arising from counsel's personal or financial interests, the interest being a pending disciplinary investigation into trial counsel's handling of an unrelated matter. My concurrence noted:

> [A]ny question of whether appellant's trial counsel was actually conflicted must be measured by the governing law as it existed when this matter was tried. As members of the bar, lawyers are obligated to recognize and avoid actual conflicts in the first instance, just as they are obligated not to pursue baseless or frivolous claims.... Appellant's current counsel is essentially claiming that trial counsel was obliged, at the time of trial, to inform the court that he had

a conflict because of the pending disciplinary investigation and to seek to withdraw from representation of appellant. But nothing in the law, either at the time of appellant's trial or now, remotely suggests that counsel was bound to view his own unrelated personal disciplinary issues, which were evidently public knowledge in the Lehigh County legal community, as creating an actual conflict with his client. In short, appellant proposes a novel and unprincipled expansion of what amounts to "actual conflict." Even if a court someday were to adopt such an odd rule, however, that new rule could not be used to retroactively condemn trial counsel's conduct decades ago.

*Id.* at 200–01. In this case, appellant's trial counsel did not perceive or pursue a claim that the circumstances of her appointment, and the fee paid to her, created a conflict with her client. As in *Lopez,* I believe that the novel conflict theory appellant poses must be deemed a non-starter on a collateral attack.

The Majority explains that this Court is not at liberty, absent further guidance from the U.S. Supreme Court, to apply *Sullivan* to find structural error premised upon appellant's novel theory of conflict of interest. Majority Op. at 428, 57 A.3d at 621. I agree. I would merely add that, given that questions alleging a violation of the Sixth Amendment right to counsel require us to view counsel's conduct under standards in existence when counsel acted, I view it as unlikely that the High Court would embrace this sort of novel theory of actual conflict upon collateral review, and then fault trial counsel under the new conflict rule. On the separate question of whether to credit aspects of appellant's underlying theory, given my reservations above concerning the cognizability of the claim on a collateral attack, I view the query as unnecessary to decide. Moreover, as the Majority makes clear, "there is little evidence of record to suggest that the fee cap resulted in an actual conflict," and, indeed, trial counsel denied the accusation. Majority Op. at 427, n. 13, 57 A.3d at 620, n. 13. The absence of any such evidence perhaps explains why appellant poses her argument in absolutist terms declaring, as

if the point could not even be disputed, that "the fee-cap created a conflict of interest" and that the cap "inevitably" affected counsel's performance in an adverse way.

Of course, there are a multitude of personal and financial circumstances which might impede any lawyer's trial performance, and in extreme cases, those circumstances may operate to render an attorney actually ineffective. See, e.g., Commonwealth v. Duffy, 483 Pa. 170, 394 A.2d 965, 967 & n. 5 (1978) (potential prejudice to defendant if allegation was elicited at trial that trial counsel was to receive stolen guns (fruits of the crime) as payment for representation created insurmountable conflict of interest). More prosaically, as this Court sees on its Miscellaneous docket, attorney lapses from such circumstances can extend to simple matters such as filing deadlines. But, as the Majority explains, the High Court's decisional law in the Sullivan/Sixth Amendment conflict of interest area has focused narrowly on dual representation of clients with diverging interests, a circumstance the Court has deemed "inherently suspect." Until the Court provides otherwise, I view conflict claims arising from counsel's personal circumstances differently, and as sounding under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a claim-specific showing of deficient performance and actual prejudice, rather than the application of the per se rule appellant asks us to innovate and retroactively enforce, premised upon a fee-cap and her broad assumptions and assertions about the "inevitable" effect of such a cap.

There are aspects of appellant's broad and per se theory of conflict with which I take particular issue, to wit, the theory assumes that the fee here was inadequate and that low fees mean counsel performed incompetently. But, whether a capped fee from decades ago is inadequate or not is a subjective matter, requiring consideration of the time, the place, the professional expectations and devotion of the attorney involved, and even the attorney's personal financial situation. In this case, it may be possible to compare the fee to counsel's ordinary fee in other matters, but we have no basis to comment upon its objective adequacy or inadequacy for the time or the place or the task. I suspect that in many counties in

Pennsylvania in 1994, assistant district attorneys and public defenders earned comparably modest hourly wages.

But, that difficulty is less important than the difficulty that the theory seeks recognition of a controlling **assumption** of actual conflict and incompetence. *Pro bono* counsel often work for no fee; are they therefore to be presumed incompetent on suspicion or insinuation that, in pursuit of remuneration from paying clients, they must invariably have sabotaged their *pro bono* clients' causes? Appellant's absolutist theory—and that is all it is—reflects a cynical and unsupportable view of the legal profession. I do not doubt that the vast majority of attorneys, regardless of financial status, consider themselves duty-bound to live up to their professional obligation when called upon for court appointment. Many lawyers consciously choose careers, in public service or elsewhere, offering relatively modest compensation, because they are drawn to the importance of the cause. This is just as applicable to the criminal defense bar. The fact that it happens is a credit to the profession as a whole. In this case, appellant's conflict of interest "theory" entails a rank speculative assumption that the fact of the fee cap, alone, created a conflict of interest because "for each hour [counsel] worked on the case, she lost money." Appellant's Brief at 19. Quite simply, this is a farfetched leap of logic.

Finally, I emphasize that my circumspection regarding appellant's *per se* Sixth Amendment conflict theory as a basis to automatically negate her conviction does not mean that I fail to recognize the importance of the issue of adequate compensation for indigent criminal defense. The fact that most appointed counsel meet the challenge does not mean that compensation levels are, or have been, appropriate or reasonable. Nor does it mean that there have not been cases where attorney compensation and support for defense investigative services have compromised counsel's ability to mount a constitutionally adequate defense. The issue of compensation is a systemic one implicating the executive branch, which is obliged to fund indigent defense services, the courts, and the criminal defense bar. As criminal defense funding is left to individual counties in Pennsylvania, and the circumstances in

individual counties vary considerably, there is no easy solution to the problem; but nobody with experience in these matters would dispute that the problem exists. For purposes of the collateral review decision here, however, and for the reasons I have stated, I simply do not believe that the Sixth Amendment, as construed by the High Court, embraces the absolutist conflict theory forwarded here.

Justice SAYLOR, concurring.

I wish, unconstrained by majority authorship, to respond to the points raised by the Chief Justice in his concurring opinion.[1]

In the first instance, in terms of the legal analysis of Appellant's attempt to invoke presumed prejudice, there seems to be little if any difference between the majority opinion and the concurrence. Indeed, the only substantive legal difference which I see between the expressions of the majority and the Chief Justice pertains to the hypothetical circumstance in which a defendant might prove through credited evidence (say, direct testimony from his attorney) that counsel prioritized his own financial interests above the interests of his client and, as a result, rendered deficient stewardship prejudicing the defense. The majority opinion refuses to rule out that a conflict claim might be stated in such a scenario, whereas, the concurrence seems largely to represent the Chief Justice's reaction to such reservation.

From my point of view, in considering matters touching on the funding of indigent defense services, the circumspection

1. Special concurrences such as this are somewhat unusual but not without precedent. *See, e.g., Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 574–76, 69 S.Ct. 1291, 1298–99, 93 L.Ed. 1544 (1949) (Jackson, J., concurring specially) ("It cannot be suggested that in cases where the author is the mere instrument of the Court he must forego expression of his own convictions."); *Abbate v. United States,* 359 U.S. 187, 196–201, 79 S.Ct. 666, 671–74, 3 L.Ed.2d 729 (1959) (Brennan, J., concurring specially); *Restrepo v. McElroy,* 369 F.3d 627, 640–45 (2nd Cir.2004) (Calabresi, J., concurring); *Lyons v. City of Xenia,* 417 F.3d 565, 580–84 (6th Cir.2005) (Sutton, J., concurring); *cf. In re Estate of Sayre,* 443 Pa. 548, 551 n. *, 279 A.2d 51, 52 n. 2 (1971) (Bell, C.J.) (expressing via footnote a Chief Justice's sentiments contrary to the majority opinion he authored).

reflected in the majority opinion is both appropriate and necessary.[2] Certainly, I agree with several of the Chief Justice's observations—self-evidently, we should not condemn criminal defense attorneys because they may be underpaid or foster a "cynical and unsupportable view of the legal profession." Concurring Opinion at 447, 57 A.3d at 632–33 (Castille, C.J.). On the other hand, however, where serious deficiencies in the rendition of attorney services are present, we should not enforce guiding presumptions woodenly or in a way which masks actual stewardship failures. *Accord Commonwealth v. Jette*, 611 Pa. 166, 191, 23 A.3d 1032, 1047 (2011) (Saylor, J., concurring) (commenting that "it remains troubling that courts shape the review process based on presumptions and pronouncements that are not empirically verified, while sometimes demonstrating limited sensitivity toward other vital interests at stake in criminal justice").

Like the Chief Justice, I have no wish to condemn anyone. Indeed, I find trial counsel's circumstances in this case to be sympathetic. Having been charged by the trial judge to perform, effectively on a shoestring, a task for which she was plainly unprepared and unqualified, I have no doubt that this lawyer did what she was able to do while also managing her regular practice.[3] Nevertheless, the attorney's interest in

2. As noted, writing from a majority posture—and particularly given the very different sentiments maintained by respected colleagues—I have tempered the comments considerably as compared with my independent writings. *See, e.g., Commonwealth v. Hutchinson*, 611 Pa. 280, 363, 25 A.3d 277, 325–26 (2011) (Saylor, J., dissenting) ("I believe that the appropriate way for this Court to address the intractable difficulties which have arisen in the death-penalty arena is to consistently enforce the requirement of an evidentiary hearing where material facts are in issue; to require appropriately developed factual findings and legal conclusions of the PCRA courts; and to apply consistent and fair review criteria on appeal."). It appears, however, that in the Chief Justice's view, such restraint is insufficient. From my own perspective, particularly given my often-repeated position that the Court and the State need to do more to remedy apparent systemic deficiencies in the arena of capital litigation, *see, e.g., id.*, I do not see how more could reasonably be expected of me.

3. The plight of solo practitioners attempting to manage capital cases should be a subject of careful study. Significantly, one group of capital

evading close scrutiny of her performance—and, yes, a critique for the sole and directed purpose of determining whether her client deserves a new trial—pales in comparison to Appellant's interest in the affordance of fair trial and penalty proceedings as a prerequisite to the imposition of a death sentence.

For such purpose—and this purpose only—I observe that trial counsel's performance in this case in no way comports with the Chief Justice's vision of attorney stewardship which is "a credit to the profession as a whole." Concurring Opinion at 445–47, 57 A.3d at 632–33. Counsel failed entirely to conduct what any competent attorney should recognize to be an indispensable centerpiece of a capital defense case (particularly where, as here, there is very strong evidence of guilt)— namely, a mitigation investigation. *See Commonwealth v. King*, No. CP–38–CR–10898–1993, *slip op.* at 25 (C.P. Lebanon July 23, 2010) ("[T]here was highly compelling mitigation evidence available for presentation to the jury if only counsel had conducted a sentencing phase investigation.").[4] Now,

defense lawyers paid at least a living wage (*i.e.*, certain members of the Philadelphia Defender Association) lays claim to an exceptionally high rate of success in avoiding the imposition of death sentences over the better part of the past two decades. As reflected in the attached appendix, however, the capital defense bar at large does not enjoy a similar rate of success.

I recognize that a mere association of this type—between better compensation and better outcomes (from a defense point of view at least)— does not establish an actual cause-and-effect relationship, since there may be other variables at work. At the very least, however, such a stark association raises cause for close study, particularly where there is evidence that indigent defense systems are impaired. *See, e.g.*, REPORT OF THE NATIONAL RIGHT TO COUNSEL COMMITTEE, JUSTICE DENIED: AMERICA'S CONTINUING NEGLECT OF OUR CONSTITUTIONAL RIGHT TO COUNSEL (Apr.2009) (embodying the analysis of a bipartisan committee of independent experts representing all segments of the Nation's justice system identifying systemic deficiencies—including pervasive underfunding of defense attorney services—and recommending reform measures); *id.* at 31 (stating that "it is totally unrealistic to expect that effective representation will be delivered unless systems of public defense are adequately funded").

4. The attorney's explanation for doing essentially nothing to prepare for the sentencing proceeding is reflected, *inter alia*, in the following interchange:

some twenty years after the fact, we can only observe the incalculable resources on the part of the Commonwealth, Appellant's multiple defense attorneys, and the courts which have been expended to reach the present state of no resolution. Presumably, there has been strain, as well, on the emotional reserves of the victim's family. Nevertheless, given trial counsel's gross dereliction, the Commonwealth must begin the penalty process anew or face the difficult decision of determining whether, at this juncture, enough is enough (such that a life sentence would be imposed).

No presumption or platitude can sweep aside this attorney's intolerably poor performance or the damage it has caused. Of greatest concern, these sorts of exceptionally costly failures, particularly as manifested across the wider body of cases, diminish the State's credibility in terms of its ability to administer capital punishment and tarnish the justice system, which is an essential component of such administration.

Attached as an appendix is a partial list of cases in which sentencing relief has been granted over the last ten years in the Pennsylvania state courts based on deficient stewardship of capital defense attorneys.[5] Notably, the list would be far longer were it to catalogue the many instances in which severe derelictions have been alleged but the defendant has been denied the opportunity to adduce supporting evidence based on other considerations, such as waiver,[6] or a finding of

> Question: Is it accurate to say that your not knowing that the sentencing phase began immediately after the guilt phase was concluded, was simply a mistake in your understanding of the procedure given that it was a death penalty case?
> Answer: Mistake, lack of energy, you can ascribe numerous words to it.
> N.T., Nov. 21, 2006, at 111.

5. I have made no attempt here to survey the decisions on federal collateral review.

6. *See, e.g., Commonwealth v. Hall*, 582 Pa. 526, 551–56, 872 A.2d 1177, 1192–95 (2005) (Saylor, J., dissenting) (commenting on an instance in which waiver was invoked, in part, by a Court majority to justify a PCRA court's decision to summarily deny a claim involving trial counsel's alleged failure to conduct a mitigation investigation).

Of course, the finding of waiver in many of these instances simply reflects another manifestation of attorney dereliction. As I have previously observed in a post-conviction setting:

insufficient prejudice.[7] Furthermore, in terms of the scope of a more complete listing, in other settings I have discussed the equally troubling questions connected with the performance of capital counsel at the appellate stage. *See, e.g., Commonwealth v. Johnson,* 604 Pa. 176, 197–98, 985 A.2d 915, 928 (2009) (Saylor, J., concurring) (expressing "continuing concern regarding the many cases in which we are seeing a clear failure, on the part of counsel, to provide professional services necessary to secure appellate review on the merits of a capital defendant's or petitioner's claims"); *Commonwealth v. Ly,* 605 Pa. 261, 262–65, 989 A.2d 2, 2–5 (2010) (Saylor, J., dissenting).

In summary, I share in the Chief Justice's praise and gratitude for pro bono attorneys and attorneys who are able to undertake representation of indigent capital defendants without compromising their practices. Nevertheless, I am unable to agree with the suggestion that the presumption of effectiveness by and large reflects the actual state of capital defense representation in Pennsylvania. I would submit that, in fact, we have seen more than enough instances of deficient stewardship to raise very serious questions concerning the presumption's accuracy. It is my considered position, like that of

> [I]n these cases in which the Court is criticizing [counsel] for the inability even to frame a claim in the only established manner in which review can be obtained, we are openly confirming a patent deficiency in such counsel's stewardship. It certainly remains arguable that ineptitude of this sort and magnitude should not redound to the detriment of an indigent petitioner pursuing what is likely to be his single opportunity to secure state post-conviction appellate review of his sentence of death.
>
> *Commonwealth v. Gwynn,* 596 Pa. 398, 421 n. 2, 943 A.2d 940, 954 n. 2 (2008) (Saylor, J., dissenting).

7. *See, e.g., Commonwealth v. Romero,* 595 Pa. 275, 312–20, 938 A.2d 362, 384–89 (2007) (plurality, in part) (rejecting an ineffectiveness claim in the circumstances involving a highly limited penalty investigation); *Commonwealth v. Brown,* 582 Pa. 461, 481, 872 A.2d 1139, 1150–51 (2005) (sustaining summary dismissal of an ineffectiveness claim, despite the trial attorney's attestation that he "was shocked by the jury's guilt-phase verdict and ... had not done any preparation for the penalty phase of the case").

Parenthetically, my own perspective in each of these cases is reflected in my dissents. *See Romero,* 595 Pa. at 335–39, 938 A.2d at 398–400 (Saylor, J., dissenting); *Brown,* 582 Pa. at 516–26, 872 A.2d at 1171–77 (Saylor, J., dissenting).

many others, that a contributing factor may be the pervasive underfunding of indigent defense. *See, e.g., supra* note 5 (citing REPORT OF THE NATIONAL RIGHT TO COUNSEL COMMITTEE, JUSTICE DENIED: AMERICA'S CONTINUING NEGLECT OF OUR CONSTITUTIONAL RIGHT TO COUNSEL (Apr.2009)). Against such a background, I do not believe that courts can justly foreclose defendants from asserting that inadequate compensation has impacted their counsel's performance.

As a postscript, very recently, this Court exercised its extraordinary jurisdiction to consider a petition challenging Philadelphia's compensation system for counsel representing indigent capital defendants. This Court appointed a special master, who reported his findings that such system is "grossly inadequate," "completely inconsistent with how competent trial lawyers work," "punishes counsel for handling these cases correctly," and "unacceptably increases the risk of ineffective assistance of counsel in individual cases." Report and Recommendations in *Commonwealth v. McGarrell*, 77 EM 2011, CP-51–CR–0014623–2009 (C.P.Phila. Feb. 21, 2012). While this Court has not yet formally reviewed these findings, they certainly are in tension with the aspirational notions fostered by the Chief Justice's concurrence, as applied in the capital arena, particularly since Philadelphia is far and away the largest contributor to Pennsylvania's death row.

### Appendix

### Sampling of Capital Cases in which Relief Has Been Granted in the Pennsylvania State Courts

- *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607 (2012) (reflecting the Commonwealth's decision to discontinue the appeal from the award of a new penalty hearing, directed on a PCRA court's finding of a failure to investigate and present mitigation evidence)

- *Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050, 1091–93 (2012) (new penalty award affirmed, where trial counsel maintained a "myopic focus only on the guilt phase"; failed to obtain life-history and mental-health records or otherwise conduct an adequate mitigation investigation; and ignored

the advice of a mental-health expert he had engaged that further mental-health testing was implicated)

- *Commonwealth v. Walker*, 613 Pa. 601, 36 A.3d 1, 5 (2011) (reflecting an unappealed new penalty hearing award based on ineffectiveness of trial counsel)

- *Commonwealth v. Smith*, 609 Pa. 605, 621, 17 A.3d 873, 882 (2011) (stipulated penalty relief based on deficient attorney stewardship)

- *Commonwealth v. Martin*, 607 Pa. 165, 207–08, 5 A.3d 177, 202–03 (2010) (new penalty award affirmed where the counsel's deficient investigation "was the result of lack of attention," and his failure to present mental-health mitigation was "unreasonable as a matter of law")

- *Commonwealth v. Smith*, 606 Pa. 127, 178, 995 A.2d 1143, 1173 (2010) ("Counsel cannot meet his obligation by relying on 'only rudimentary knowledge of [the defendant's] history from a narrow set of sources,' which is exactly what [the defendant's attorney] did[;] [t]his is the type of case ... where 'potentially powerful mitigating evidence ... would have been apparent from documents any reasonable attorney would have obtained' " (citations omitted))

- *Commonwealth v. Williams*, 602 Pa. 360, 371, 980 A.2d 510, 517 (2009) (reflecting the Commonwealth's eventual concession, some twenty years post-trial, that a new penalty hearing was warranted)

- *Commonwealth v. Beasley*, 600 Pa. 458, 462–63, 967 A.2d 376, 379 (2009) (reflecting a remand where trial counsel attested that he was not aware that he could adduce life-history and mental-health information in penalty proceedings and that he conducted no investigation along such lines)

- *Commonwealth v. Johnson*, 600 Pa. 329, 342, 966 A.2d 523, 531 (2009) (reflecting a PCRA court's determination that a trial attorney "completely abrogated his duty to [the defendant]," in a matter remanded for a determination of prejudice)

- *Commonwealth v. Collins*, 598 Pa. 397, 408, 957 A.2d 237, 243 (2008) (unappealed award of new penalty hearing)

- *Commonwealth v. Sattazahn,* 597 Pa. 648, 664, 952 A.2d 640, 649 (2008) (new penalty hearing awarded where, as recounted by the PCRA court, trial counsel "failed to adequately investigate substantial mitigating factors, even though the record was replete with 'red flags' of brain damage that indicated the need for neuropsychological evaluations," and "did not conduct a thorough investigation of his client's background" (citation omitted))

- *Commonwealth v. Williams,* 597 Pa. 109, 127, 950 A.2d 294, 305 (2008) (new penalty award affirmed, where "the omission from consideration by the sentencing jurors of the diagnosis of Axis I major mental-health disorders and recent psychiatric hospitalizations occurred ... in the absence of a sufficient investigation and without strategic or tactical justification")

- *Commonwealth v. Cooper,* 596 Pa. 119, 145, 941 A.2d 655, 671 (2007) (Castille, J., concurring) (new penalty hearing due where, in the words of a concurring Justice, trial counsel "pitifully botched" his own misguided attempt to introduce an irrelevancy)

- *Commonwealth v. Gorby,* 589 Pa. 364, 390–91, 909 A.2d 775, 791 (2006) (denial of new penalty hearing overturned, where trial counsel failed to explore well-travelled avenues of mitigation investigation, presented a "remarkably weak" penalty defense, and failed even to secure a jury instruction by which jurors could give effect to the only category of mitigation evidence which he did present)

- *Commonwealth v. Sneed,* 587 Pa. 318, 345, 899 A.2d 1067, 1083 (2006) (new penalty award sustained where counsel "failed to conduct even a cursory investigation into [the defendant's] background")

- *Commonwealth v. May,* 587 Pa. 184, 213, 898 A.2d 559, 576 (2006) (OAJC) (denial of new penalty hearing overturned, where trial counsel failed to adequately address unreasonable trial-court refusal to admit relevant mitigation)

- *Commonwealth v. Collins,* 585 Pa. 45, 75–76, 888 A.2d 564, 582 (2005) (new penalty hearing award sustained where trial

counsel failed to obtain life-history records or otherwise conduct a reasonable investigation)

- *Commonwealth v. Zook*, 585 Pa. 11, 38, 887 A.2d 1218, 1235 (2005) (new penalty hearing required where inadequate penalty presentation "simply was a result of inattention to the mitigating evidence that was known, or should have been known, to counsel")

- *Commonwealth v. Jones*, 583 Pa. 130, 135, 876 A.2d 380, 384 (2005) (reflecting an unchallenged award of penalty relief where "trial counsel failed to investigate and develop mitigating evidence")

- *Commonwealth v. Gribble*, 580 Pa. 647, 684, 863 A.2d 455, 477 (2004) (reflecting vacation of a PCRA court's summary award of a new penalty hearing and remand; however, new penalty proceeding awarded following a hearing as recounted in Brief for Appellee in *Commonwealth v. Gribble*, No. 1042 EDA 2009, 2010 WL 4338675 (June 21, 2010), at *8).

- *Commonwealth v. Malloy*, 579 Pa. 425, 456, 856 A.2d 767, 786 (2004) (new penalty hearing awarded where "[i]t is apparent from this record that counsel undertook little or no affirmative effort aimed at the penalty phase of trial")

- *Commonwealth v. Harris*, 578 Pa. 377, 383 n. 6, 852 A.2d 1168, 1171 n. 6 (2004) (new penalty hearing awarded by a PCRA court based on deficient stewardship, which the Commonwealth did not appeal)

- *Commonwealth v. Brooks*, 576 Pa. 332, 337 839 A.2d 245, 249 (2003) (new trial awarded, where the defense attorney "never once met with [his client] before his trial on capital charges")

- *Commonwealth v. Chambers*, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002) (new penalty hearing where trial counsel unreasonably failed to object to confusing jury instruction concerning mitigating circumstances)

- *Commonwealth v. O'Donnell*, 559 Pa. 320, 347 n. 13, 740 A.2d 198, 214 n. 13 (2002 [1999]) (new penalty hearing

granted on other grounds; however, the majority expressed "serious doubts regarding counsel's effectiveness," where the attorney "presented virtually no evidence of [the defendant's] upbringing or background" and "did not call a single witness on [the defendant's] behalf")

Justice EAKIN, concurring.

I join Chief Justice Castille's Concurring Opinion, and its joinder of the Majority Opinion. If fee caps may create a "conflict of interest," then, *a fortiori, pro bono* representation creates a conflict—if too little payment can do so, no payment at all would almost certainly do so. Of course, the truth is that countless attorneys handle countless legal matters for people with little or no compensation. This does not mean evidence "that counsel prioritized his own financial interests above the interests of his client and, as a result, rendered deficient stewardship prejudicing the defense" would not allow for a claim of ineffectiveness. Concurring Op., at 448, 57 A.3d at 633–34 (Saylor, J., concurring). Such would be an admission of ineffectiveness, contrary to "prevailing professional norms," and counsel's reasoning for his ineffectiveness would be inconsequential to the determination. *See id.* at 421–23, 57 A.3d at 617–18 (citing *Bobby v. Van Hook,* 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009)). However, it would not be based on a conflict of interest. The love of money may be the root of all evil and some ineffectiveness, but by itself, it does not create a legal conflict of interest.