J-S21035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                          :         PENNSYLVANIA
                                          :
             v.                           :
                                          :
                                          :
JOSHUA LEE STEWART,             :
             Appellant        :
                                          :        No. 1454 WDA 2019

Appeal from the PCRA Order Entered August 22, 2019
in the Court of Common Pleas of Mercer County
Criminal Division at No(s):  CP-43-CR-0000122-2012

BEFORE:  LAZARUS, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:            **FILED JULY 21, 2020**

Joshua Lee Stewart ("Stewart") appeals from the Order denying his first

Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").

**See** 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

The PCRA court summarized the facts of this case as follows:

On December 30, 2011, [Stewart] decided[,] along with his co-conspirator [Devine Campbell ("Campbell"),] to rob the patrons and [the] bar known as the Basilone Bar and Restaurant [("Basilone's Bar")] in [Farrell], Mercer County, Pennsylvania. They recruited [Tylor Kalenic ("Kalenic")] by asking him to join them in "hitting a lick."  These three young men had one weapon among them[,] which was a .22 caliber pistol that [was] always in the possession and control of []Stewart.

     Basilone's [B]ar had a video surveillance system with two cameras[:] one on the outside showing the sidewalk and street area[,] and another on the inside showing the patrons of the bar and the cash register towards the front of the building. Throughout the jury trial, the Commonwealth continuously played various portions of the surveillance video through different witnesses[,] who identified the people on the videos.  All three defendants were depicted walking around the bar and past the bar

on different occasions throughout the night. In fact, [Kalenic] was shown walking into the bar and pretending to order a pizza so that he could see how many patrons were inside and report back to his co-defendants. Eventually, [Kalenic] grew weary of the plot and decided to go home before any attempt to enter the bar and commit the robberies at gunpoint. He lived approximately seven houses north of the bar[,] along an alley that was adjacent to the bar.

[Kalenic] was a key Commonwealth witness[. Kalenic] was not charged with any offenses in exchange for his testimony[. Kalenic] testified that he watched from his kitchen window in the back of his house looking up the alley towards the bar and was able to see both []Stewart and []Campbell in the alley. Just moments prior[], the video surveillance showed []Stewart putting on his mask and attempting to open the front door of the bar, but it was locked. []Stewart and []Campbell then walked into the alleyway next to the bar to decide what to do next.

[A few minutes later,] William Basilone [("Basilone")], [the owner of] the bar, walked out the front door and along the front sidewalk to the edge of the alleyway[,] where he was confronted by []Stewart[. Stewart then] shot and killed [Basilone]. [Kalenic] testified that he viewed this from his back window seven houses away and saw []Campbell [and Stewart] run down the alley towards [Kalenic's] house[]. Both [Stewart and Campbell] arrived moments later at []Kalenic's house and all three of them were picked up by two [young women] and driven away from the scene.

\*   \*   \*

The Commonwealth also called as witnesses the two young women who were involved with []Stewart and []Campbell[. The women were in] contact [with Stewart and Campbell] by text messaging throughout the evening. Those text messages [were introduced by the Commonwealth as evidence to further establish the conspiracy charges].

After Stewart and Campbell were arrested and incarcerated[], they allegedly hatched a plot to have each of their brothers impregnate each of these women in the hopes that that would prevent [the women] from testifying at the trial or getting them to be alibi witnesses. In fact, both of these women did become pregnant after Stewart and Campbell were incarcerated through relationships they had with [Stewart and Campbell's]

respective brothers. However, neither of the women knew about any such plot.

[T]he Commonwealth relied []on a jailhouse snitch, Cedric Boyd [("Boyd")], who claimed to have verbal and written correspondence between himself and Stewart while they were in the Mercer County Jail describing this pregnancy plot and also making various admissions as to [Stewart's] culpability in these crimes. []Boyd was called as a witness on behalf of the Commonwealth at []Stewart's trial and testified that he had been [in prison] at SCI Albion for about 33 months awaiting trial on sexual assault and simple assault cases in Mercer County[. Boyd was] periodically transported back and forth from [SCI] Albion and [] the Mercer County Jail. []Boyd conceded that he had spent about a quarter of his life [in prison,] and that he had a federal conviction for robbery about 20 years earlier as well as a retail theft conviction in 2008 and a federal detainer was pending for alleged probation violations based upon the new Mercer County charges. []Boyd conceded that he is a jailhouse snitch and had cooperated with the government several times in the past.

[Boyd] testified that []Stewart approached him in the Mercer County Jail for legal advice[,] and that over several months in 2012[,] prior to [Stewart]'s trial[,] they had various discussions about [Stewart's] case as well as written correspondence. [The Commonwealth introduced two letters purportedly exchanged between Boyd and Stewart.] Initially, [Stewart indicated] that [Kalenic] was the one who shot [Basilone] in the alley after their initial plot to rob the bar failed because of the locked front door. [Stewart] had told him [*sic*] that they needed money to take girls to a hotel. [Stewart] expressed to [Boyd] that he did not want to be a snitch and tell everybody that [Kalenic] had done the shooting and [Stewart] wanted advice[.]

For some reason, [Boyd] did not believe he was getting [the] full story, so he pressed []Stewart that he could only help … if he told [Boyd] the truth. Eventually, []Stewart admitted that [Stewart was the one who had shot Basilone and that Kalenic had left before the shooting.] According to [Boyd], [Stewart] told him that when []Basilone came out to the alley, [Stewart] demanded money from [Basilone] but was told [Basilone] had [no money. Stewart proceeded to shoot] Basilone in the chest and then kept shooting [before running] to [Kalenic]'s house after the shooting.

[]Boyd also claimed that []Stewart told him that he and []Campbell both had brothers who they requested to contact the [two women], romance them and get them pregnant so that the sisters could be used as alibi witnesses. Around October 2012, when [Boyd] was at the Mercer County Jail, he further claims that []Stewart told him that their brothers were successful and that both sisters were pregnant.

[Throughout] his testimony, []Boyd conceded that he has been a long-time jailhouse snitch and that while he had no specific plea agreement in his pending Mercer County cases, [the District Attorney was going to] advise [Boyd's] judge of his cooperation in [the] murder trial. [Boyd] also received other minor benefits such as the county detective transporting his mother from Mercer County to SCI Albion to visit him. []Boyd had also conceded that he had given various fake names in his past.

\* \* \*

[The Commonwealth also called] Gary J. Thomas, Jr. [("Thomas")], [who] testified that on December 30, 2011[,] he was on his way home from work and at about 11:30 to 11:40 p.m. he pulled into the parking lot of Razzcals bar in Farrell…. [Thomas] heard several pops that he thought were firecrackers coming from the area of Basilone's [B]ar[,] about a block away. [Thomas] looked down the street at Basilone's [B]ar and saw a white man walk out of the alley toward him[. The man stumbled] as though he [was] drunk[,] and then [Thomas] saw a person come up from behind [the man], raise his arm and shoot [the man] four times in the back. The white man then fell forward onto the sidewalk and his assailant stood over him and shot him three more times as he laid there. [Thomas testified that t]he gunman was a black male who was wearing a grey hooded sweatshirt with the hood up[.]

Karla Dunlevy [("Dunlevy")] was also called as a witness for the Commonwealth and she testified that on December 30, 2011[,] between 11:30 and 11:40 p.m., she was in the kitchen of her second floor apartment[,] cattycorner from Basilone's [B]ar[,] making ham and bean soup[,] when she heard what she thought were firecrackers. She looked out and saw a pinkish/orangish glow off and on and then went on her back porch[, where she] could see the front of the bar [as well as] part of the alley. She saw a white person getting shot by a person with a hoodie

shooting down on the other person. She was unable to determine the race or gender of the shooter.

PCRA Court Memorandum Opinion and Order, 8/22/19, at 3-9.

Stewart and Campbell were tried separately. On September 17, 2013, Stewart was convicted by a jury of one count each of murder in the first degree and murder in the second degree, and two counts each of robbery and conspiracy.[1] Stewart was sentenced to serve two mandatory life sentences, one at each murder conviction, as well as an aggregate concurrent sentence of 20 to 40 years in prison for the remaining offenses. This Court affirmed Stewart's judgment of sentence, after which the Pennsylvania Supreme Court denied allowance of appeal. *See Commonwealth v. Stewart*, 105 A.3d 789 (Pa. Super. 2014) (unpublished memorandum), *appeal denied*, 108 A.3d 35 (Pa. 2015).

On January 6, 2016, Stewart, *pro se*, timely filed the instant PCRA Petition. The PCRA court appointed Stewart counsel, who filed three Amended PCRA Petitions. The PCRA court conducted three evidentiary hearings, at which, Stewart argued, *inter alia*, that his sentence was illegal because his convictions of murder in the first degree and murder in the second degree should have merged for sentencing purposes. The PCRA court agreed and granted Stewart relief as to the sentencing issue. The PCRA court merged the offenses, and resentenced Stewart to a single mandatory life sentence. *See*

---

[1] 18 Pa.C.S.A. §§ 2502(a), (b); 3701(a)(1)(i), (ii); 903(a)(1

PCRA Court Memorandum Opinion and Order, 8/22/19, at 9-10. The PCRA

court denied Stewart's Petition in all other respects. *Id.* at 10-26. The PCRA

court issued its Memorandum Order and Opinion explaining its reasoning on

August 22, 2019. Stewart timely filed the instant appeal on September 23,

2019.[2] Stewart filed a court-ordered Concise Statement of errors complained

of on appeal pursuant to Pa.R.A.P. 1925(b). On October 18, 2019, the PCRA

court issued its 1925(a) Opinion incorporating its August 22, 2019,

Memorandum Order and Opinion.

Stewart now presents the following claims for our review:

(1) Whether the [PCRA c]ourt erred in denying [Stewart]'s [PCRA] Petition issue alleging that trial counsel was ineffective for failing to properly impeach [the] Commonwealth's witness, [Kalenic], pertaining to his ability to see the crime scene from his house?

(2) Whether the PCRA [c]ourt erred in denying [Stewart]'s PCRA [Petition] issue pertaining to trial counsel's failure to properly investigate the view of the crime scene from [the] Commonwealth's witness, [Kalenic]'s, kitchen window?

(3) Whether the PCRA [c]ourt erred in denying [Stewart]'s PCRA [Petition] issue alleging that trial counsel was ineffective for failing to object to testimony of the plot by [Stewart and his co-defendant] to have their [respective] brothers impregnate[] two[] female [Commonwealth] witnesses to prevent them from testifying?

(4) Whether the PCRA [c]ourt erred in denying [Stewart]'s PCRA [Petition] issue pertaining to newly discovered evidence that

_____

[2] The 30th day following the entry of the PCRA court's Order was September 21, 2019, a Saturday. *See* Pa.R.A.P. 903(a). Thus, Stewart had until Monday, September 23, 2019, to file his Notice of Appeal. *See* 1 Pa.C.S.A. § 1908 (providing that, regarding the computation of time, "[w]henever the last day of any such period shall fall on Saturday or Sunday, … such day shall be omitted from the computation.").

would have destroyed the credibility of [the] Commonwealth's witness [Boyd]?

Brief for Appellant at 4 (issues renumbered).

When reviewing an appeal from the denial of PCRA relief,

we must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. The findings of the PCRA court and the evidence of the record are viewed in a light most favorable to the prevailing party. The PCRA court's credibility determinations, when supported by the record, are binding; however, this court applies a *de novo* standard of review to the PCRA court's legal conclusions. We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. Finally, the Court may affirm a valid judgment or order for any reason appearing of record.

*Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019) (citations

omitted).

Stewart's first three claims challenge the effectiveness of trial counsel.

Counsel is presumed to be effective and "the burden of demonstrating

ineffectiveness rests on [the] appellant." *Commonwealth v. Rivera*, 10

A.3d 1276, 1279 (Pa. Super. 2010).

To satisfy this burden, an appellant must plead and prove by a preponderance of the evidence that[] (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness there is a reasonable probability that the outcome of the challenged proceeding would have been different. Failure to satisfy any prong of the test will result in rejection of the appellant's ineffective assistance of counsel claim.

*Commonwealth v. Holt*, 175 A.3d 1014, 1018 (Pa. Super. 2017) (internal

citations and quotation marks omitted).

Generally, counsel's assistance is considered effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. **Commonwealth v. Ali**, 10 A.3d 282, 291 (Pa. 2010). Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." **Commonwealth v. Colavita**, 993 A.2d 874, 887 (Pa. 2010) (quotation marks omitted). Further, to demonstrate prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." **Commonwealth v. King**, 57 A.3d 607, 613 (Pa. 2012). "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceedings." **Ali**, 10 A.3d at 291.

In his brief, Stewart addresses his first two claims together. Stewart claims that his trial counsel, James Goodwin, Esq. ("Attorney Goodwin"), was ineffective for failing to cross-examine Kalenic about his view of the shooting. Brief for Appellant at 7. Stewart alleges that Kalenic would not have been able to see the shooting from his kitchen window. **Id.** Further, Stewart argues that Attorney Goodwin was ineffective for failing to investigate Kalenic's view from his kitchen window. **Id.** Stewart contends that Kalenic's view was obstructed and that Kalenic would not have been able to see the shooting from

his kitchen. *Id.* at 8. Additionally, Stewart points to the testimony of John Jarrett Kennedy Whalen, Esq. ("Attorney Whalen"), who represented Campbell at Campbell's trial, that his team took photos from the outside of Kalenic's kitchen window in the direction of the scene. *Id.* Stewart claims that the photographs taken by Attorney Whalen's team were "vastly different" from the photographs presented by the Commonwealth at Stewart's trial and, thus, Attorney Goodwin was ineffective. *Id.*[3]

Stewart has failed to adequately develop these claims for our review. In his brief, Stewart discusses these claims together and fails to advance any argument that would satisfy the prongs of the ineffectiveness test. *See Commonwealth v. Chmiel*, 30 A.3d 1111, 1128 (Pa. 2011) (noting that boilerplate allegations and bald assertions cannot satisfy a petitioner's burden to prove ineffective assistance of counsel); *see also Holt, supra*. Accordingly, Stewart's first two claims fail.

Moreover, as the PCRA court notes, there was more than ample evidence presented at trial to corroborate Kalenic's testimony regarding his view of the shooting. *See* PCRA Court Memorandum Order and Opinion, 8/22/19, at 10-15. Additionally, in rejecting these claims, the PCRA court

---

[3] At the final PCRA hearing, Attorney Whalen testified that his team investigated and took pictures from Kalenic's kitchen window towards the crime scene. N.T. (PCRA Evidentiary Hearing), 1/8/19, at 3, 5-6. Contrary to Stewart's assertion, Attorney Whalen stated that the Commonwealth's photographs were "from a lower vantage point" than Attorney Whalen's, but were ultimately very similar. *Id.* at 6-11.

found that Kalenic's testimony of what occurred in the alley is consistent "with the physical evidence discovered in the alley after the shooting,[]the testimony of [Thomas,]" and the multitude of photographs presented by the Commonwealth. *Id.* at 11. The Commonwealth's photographs depicted not only Kalenic's view from his kitchen, but also a clear view from the scene to Kalenic's kitchen window. *Id.* at 11; *see also* N.T. (PCRA Evidentiary Hearing), 12/5/18, at 10, 30. The Commonwealth further introduced photographs showing that there "are no trees or bushes in the backyards of those homes that would obstruct [Kalenic's] view." *See* PCRA Court Memorandum Order and Opinion, 8/22/19, at 11; *see also* N.T. (PCRA Evidentiary Hearing), 12/5/18, at 30.

Thus, the record reveals that the physical evidence presented at trial confirmed Kalenic had a clear view of the scene.[4] Based upon the foregoing, Stewart has failed to demonstrate that there was a reasonable probability that the outcome of Stewart's trial would have been different. *See King, supra*; *see also Ali, supra*; *Holt, supra.* Accordingly, as Stewart failed to establish

---

[4] We observe that the testimony from other witnesses confirmed Kalenic's testimony regarding the shooting. At trial, the Commonwealth presented the testimony of Thomas and Dunlevy, who both testified that they heard a sound of "firecrackers" and saw a white man getting shot by a person in a grey hoodie outside of Basilone's Bar. *See* N.T. (Jury Trial), 9/12/13, at 91, 95-96, 105-110; *see also* PCRA Court Memorandum Order and Opinion, 8/22/19, at 8-9.

that he was prejudiced by counsel's alleged failures, he is not entitled to relief on these two claims.

In Stewart's third ineffectiveness claim, he asserts that Attorney Goodwin was ineffective for failing to object to Boyd's testimony as to the "pregnancy plot." *See* Brief for Appellant at 11. Stewart contends that the "pregnancy plot" was too "far[-]fetched to believe that both co-defendant's brothers [] deliberately impregnated the two [women] to eliminate their testimony." *Id.* at 12. Stewart further argues that "[a]llowing the jury to consider this evidence would clearly have inflamed the jury and possibly could have led to an unfair verdict." *Id.*

In his appellate brief, Stewart again failed to develop any prong of the ineffective assistance of counsel test and, therefore, his claim is not adequately developed for our review. *Id.* at 11-12; *see Chmiel, supra*; *see also Holt, supra*. Accordingly, Stewart's third claim fails.

Even if Stewart had developed this claim, we would afford him no relief on this claim. Notably, Attorney Goodwin testified at the PCRA hearing that the alleged pregnancy plot was "far[-]fetched" and "didn't make any sense." N.T. (PCRA Evidentiary Hearing), 12/5/18, at 18, 20, 29. Further, Attorney Goodwin testified that the testimony about the alleged pregnancy plot was brief and he did not want to call the jury's attention to the plot by objecting to it. *Id.* Additionally, in Attorney Goodwin's experience, to "challenge [or]

object to certain testimony [] simply has the effect of highlighting that testimony." *Id.* at 29.

In rejecting this claim, the PCRA court determined that Attorney Goodwin had a "legitimate tactical reason not to bring further attention to this pregnancy plot by objecting to it." *See* PCRA Court Memorandum Order and Opinion, 8/22/19, at 18. Further, the PCRA court noted that even if the objection had been made and sustained, the Commonwealth had presented sufficient evidence to sustain Stewart's convictions otherwise. *Id.* We agree with the reasoning of the PCRA court. *See Ali, supra*; *see also Colavita, supra*. Accordingly, Stewart's trial counsel had a reasonable basis for not objecting to the testimony and did not provide ineffective assistance on these grounds, and Stewart's third claim fails.

Finally, Stewart claims that the PCRA court erred by failing to grant him a new trial based on new evidence "that would have destroyed the credibility" of Boyd. *See* Brief for Appellant at 10. Specifically, Stewart alleges that Robert Mickens ("Mickens") and Shawn Currie ("Currie"), two inmates, had "knowledge pertaining to the testimony that [Boyd] offered at [Stewart]'s trial." *Id.* Stewart asserts that "the testimonies of [Mickens] and [Currie] would have shed some doubt on the truthfulness of [Boyd's] testimony at [Stewart]'s trial." *Id.*

Under the PCRA,

> where a petition is otherwise timely, to prevail on an after-discovered evidence claim for relief under [42 Pa.C.S.A.

§] 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. ***Commonwealth v. D'Amato***, 856 A.2d 806, 823 (Pa. 2004); ***see*** [***Commonwealth v.***] ***Cox***, 146 A.3d [221,] 227-28 [(Pa. Super. 2016)] ([stating that] "[o]nce jurisdiction has been properly invoked, … the relevant inquiry becomes whether the claim is cognizable under [Section 9543] of the PCRA.").

***Commonwealth v. Burton***, 158 A.3d 618, 629 (Pa. 2017) (citation omitted).

In his brief, Stewart concedes that the new evidence would only challenge the credibility of Boyd. ***See*** Brief for Appellant at 10. We agree and, thus, we cannot grant Stewart relief on this claim. ***See*** 42 Pa.C.S.A. § 9543(a)(2)(vi)(2).

Based on the foregoing, we affirm that the PCRA court's Order denying Stewart's Petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2020

- 13 -