J-S44018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES LAWRENCE GLENN, JR. | : | |
| | : | |
| Appellant | : | No. 694 MDA 2020 |

Appeal from the PCRA Order Entered April 22, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0004103-2017

BEFORE: BENDER, P.J.E., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED MARCH 01, 2021**

Appellant James Lawrence Glenn, Jr., appeals from the order denying, after an evidentiary hearing, his first Post Conviction Relief Act[1] (PCRA) petition.  On appeal, Appellant contends that the PCRA court erred by finding that he did not establish his plea counsel had an actual conflict of interest by representing him and his co-defendant.  We affirm.

We adopt the facts and procedural history set forth in the PCRA court's opinion.  **See** PCRA Ct. Op., 6/4/20, at 2-4 (noting the surveillance video of robbery, the police apprehension of Appellant and co-defendant Damir Glenn (Damir) shortly after the robbery, and the recovery of the robbery proceeds from Damir's distinctive vehicle, which was at scene).  Damir told the police

_____

[1] 42 Pa.C.S. §§ 9541-9546.  We also cite to the reproduced record for the parties' convenience.

that he drove Appellant to the mall to commit a robbery and knew that he was taking Appellant to rob someone. ***Id.*** at 3; ***see also*** R.R. at 243a (reproducing a police incident report containing Damir's statements to police)). Michael Quinn, Esq., represented both Appellant and Damir. PCRA Ct. Op. at 4.

On April 6, 2018, Damir pled guilty that morning to robbery and conspiracy, Appellant pled guilty later that same day, and on June 18, 2018, the trial court sentenced Appellant to an aggregate sentence of six to twenty years' imprisonment. ***Id.*** On July 2, 2018, the trial court docketed Appellant's post-sentence motion, which was dated June 26, 2018. The trial court denied same on August 28, 2018. Appellant did not take a direct appeal.[2]

On October 23, 2018, Appellant filed his first *pro se* PCRA petition, which contended, among other things, that Attorney Quinn had a conflict of interest.[3] We do not summarize the lengthy subsequent procedural history, but note

---

[2] On September 19, 2018, Appellant filed a *pro se* motion for an extension of time to file an appeal. Mot. for Extension of Time, 9/19/18. Within the motion, Appellant alleged that he dismissed Attorney Quinn from representing him on September 14, 2018. The record does not reflect Attorney Quinn filed a motion to withdraw from representing Appellant or some other indication that the trial court granted Attorney Quinn permission to withdraw. On September 27, 2018, the trial court granted Appellant's motion and directed Appellant to appeal within sixty days. Appellant, however, did not appeal.

[3] The PCRA court initially appointed Osmer S. Deming, Esq., as Appellant's PCRA counsel. On February 4, 2019, Attorney Deming filed a petition to withdraw, which the PCRA court granted in an order dated April 11, 2019. The order was timestamped February 4 and February 13, 2019, but does not appear in the docket.

that on October 21, 2019, Daniel A. Pallen, Esq., entered his appearance as Appellant's PCRA counsel. On November 4, 2019, Appellant filed a counseled second amended petition for PCRA relief. In relevant part, Appellant contended that Attorney Quinn had a conflict of interest due to his dual representation of Appellant and Damir. Second Am. PCRA Pet., 11/4/19, at 2-3.

On December 17, 2019, the PCRA court held an evidentiary hearing, at which Appellant, Attorney Quinn, Damir, and Appellant's wife testified. In pertinent part, Appellant's PCRA counsel examined Attorney Quinn about his dual representation:[4]

> [Appellant's PCRA counsel:] . . . And do you admit today sitting where you are on the stand that the representation of [Appellant] was adverse to Damir Glenn?
>
> [Attorney Quinn:] They were charged with conspiracy. And by the very nature of the conspiracy charge, they could be in conflict with each other. So based upon that, I suggested to them that they

---

[4] Attorney Quinn testified that he specifically recalled discussing the potential of a conflict with both Appellant and Damir together. N.T. PCRA Hr'g, 12/17/19, at 15-17. Attorney Quinn denied memorializing Appellant's and Damir's informed consent reduced to writing. *Id.* at 18.

In contrast, Appellant testified that Attorney Quinn initially only represented him. *Id.* at 76. Appellant testified that after a week, Attorney Quinn also began to represent Damir without discussing any potential conflict with Appellant. *Id.* at 77. Appellant denied ever meeting Attorney Quinn together with Damir and signing a written agreement of representation or a waiver of conflict. *Id.* Appellant testified that Damir "never mentioned anything about signing any waivers or any contracts." *Id.* at 93. Appellant's wife also testified and denied seeing Appellant sign "anything" at Attorney Quinn's office. *Id.* at 107. She also denied being present with Damir in Attorney Quinn's office. *Id.* at 108.

could have their own lawyers but if they want, they can waive that conflict and if they have any questions in regards to what the conflict is, I would answer them 'cause, clearly, you know, my concern was is that it's their decision to waive that conflict, not mine.

\* \* \*

[Appellant's PCRA counsel:] So what -- just generally speaking, what was your defense strategy for representing the two of these gentlemen at the same time?

[Attorney Quinn:] Well, it wasn't about a defense strategy. From the very beginning, it was -- they acknowledged that they made a horrible mistake. It wasn't as if they were going to go to trial. We discussed, you know, what the evidence would be if either one or both went to trial. We went over the videotape.

We, you know, went through each and every photograph and statement that was offered by the police, so it was more about -- like I said, it wasn't a who-done-it. It was about preparation for mitigation in regards to a guilty plea.

[Appellant's PCRA counsel:] Well, you would agree with me, wouldn't you, that at any point either one of the two defendants that you represented could have elected their right to trial, true?

[Attorney Quinn:] Sure, absolutely.

[Appellant's PCRA counsel:] And if they did, would not the Commonwealth have sought to have one testify against the other?

[Attorney Quinn:] If they wanted to ask either one if they went to trial as a condition of the plea, they could have; but they didn't.

[Appellant's PCRA counsel:] So from your recollection, at no point did the Commonwealth ever solicit the testimony from one against another?

[Attorney Quinn:] No.

N.T. PCRA Hr'g at 18-19; **see also id.** at 29.

Appellant's PCRA counsel followed-up with respect to Attorney Quinn's defense strategy:

> [Appellant's PCRA counsel:] But there were various defenses, would you agree, that would have been available to [Appellant]? Could you think of any?
>
> [Attorney Quinn:] Various defenses, yeah, he could have blamed the codefendant. I mean, that's always available in codefendant cases.

*Id.* at 26.

> [Appellant's PCRA counsel:] . . . So there was -- so you would agree with me, then, that there was a threat that one of these two defendants could have turned their backs against each other, for example, and not have gone along with a guilty plea, correct?
>
> [Attorney Quinn:] Well, you're asking me about a hypothetical that didn't occur.
>
> \*    \*    \*
>
> [Attorney Quinn:] -- if there was the potentiality that either of them wanted to go to trial, then, yes, I would agree with you. But from the very onset of my representation, knowing what the facts are then and knowing what the evidence is now, my preparation, my advice, my theory, my defense didn't change.
>
> [Appellant's PCRA counsel:] So am I hearing you correctly that had you just have represented [Appellant], are you effectively telling me that you wouldn't have changed your course of how you did this?
>
> [Attorney Quinn:] I would have recommended to [Appellant] that based upon the evidence -- and that's all we can, you know, base it upon -- is that it would make more sense for him enter a plea and try to convince the judge based upon his prior behavior and how successful he was in his businesses and the fact that he was, you know, a good and loving and caring husband and father, that I thought that the judge would separate that idiotic compulsive act from the rest of his life. And the judge, I guess in some instances, agreed with me.

- 5 -

*Id.* at 41-42.

On cross-examination, Attorney Quinn emphasized that in his view, this was not "a good case to take to trial" because "the evidence was overwhelming." *Id.* at 49. Attorney Quinn reiterated that "because they weren't going to go to trial," he agreed that "it was always about getting the best deal available" for Appellant and Damir. *Id.* at 52. Attorney Quinn denied telling Appellant that Damir was willing to testify against Appellant. *Id.* at 57.

In relevant part, Appellant testified that Attorney Quinn said that "we'll get rid of [Damir's police] statement so that won't affect" Appellant. *Id.* at 76-77. Appellant claimed that after he rejected the initial plea offer, the assistant district attorney "turned to [him] and [Attorney] Quinn and he said: Well, if he doesn't take the plea, then I'm going to make Damir testify against him." *Id.* at 89. Appellant claimed he was innocent and that if Attorney Quinn had filed a motion to suppress Damir's police statement and the identification, he "would have actually had a case." *Id.* at 94. Damir also testified at the PCRA hearing and claimed that Attorney Quinn "pretty much kind of said that if I [made a statement against Appellant], I would get a better deal." *Id.* at 112-13.

On April 15, 2020, the PCRA court denied relief. Order, 4/15/20. The PCRA court did not make any explicit credibility determinations in its reasoning denying relief. *Id.* On May 6, 2020, Appellant timely appealed. The PCRA

court did not order Appellant to comply with Pa.R.A.P. 1925(b), but filed a Rule 1925(a) opinion essentially reiterating its April 15, 2020 order.

Appellant raises the following issue:

Did the PCRA court err in finding that [Appellant] failed to establish an "actual conflict of interest" existed by way of Attorney Quinn's dual representation of [Appellant and co-defendant Damir]?

Appellant's Brief at 4.

In support of his sole issue, Appellant argues that he proved "an actual conflict of interest . . . and is therefore entitled to a new trial." *Id.* at 10. Appellant emphasizes that the PCRA court "concede[d] that there was a conflict of interest" between Appellant and Damir being represented by Attorney Quinn. *Id.* Appellant asserts that the PCRA court erred by not holding that (1) that there was an actual conflict of interest, and (2) Attorney Quinn actively represented conflicting interests. *Id.* Appellant asserts that he established "the possibility of harm" required to prove an actual conflict of interest. *Id.* at 13. In support, Appellant discusses, among other cases, *Commonwealth v. Jones*, 257 A.2d 367 (Pa. Super. 1969), *Commonwealth v. Johnson*, 299 A.2d 367 (Pa. Super. 1973), and *Commonwealth v. Breaker*, 318 A.2d 354 (Pa. 1974).[5]

---

[5] The Commonwealth counters that Appellant failed to establish an actual conflict of interest. Commonwealth's Brief at 11. The Commonwealth acknowledges Damir's police statement inculpating Appellant, but argues that Attorney Quinn "never planned for either case to go to trial due to the strength

Our standard of review follows:

> [O]ur standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.
>
> Furthermore, to establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.
>
> We have explained that a claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

---

of the Commonwealth's case." ***Id.*** at 12. The Commonwealth emphasizes Attorney Quinn's testimony that Attorney Quinn discussed the conflict of interest with both Appellant and Damir, and that both verbally consented to the dual representation. ***Id.***

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective. Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043-44 (Pa. Super. 2019) (citations omitted and formatting altered), *appeal denied*, 216 A.3d 1029 (Pa. 2019). We may affirm on any basis. ***Commonwealth v. Clouser***, 998 A.2d 656, 661 n.3 (Pa. Super. 2010).

In ***Commonwealth v. King***, 57 A.3d 607 (Pa. 2012), our Supreme Court explained that an active conflict of interest in dual representation involves

representation of more than one client, where the clients have diverging interests. ***See, e.g.***, ***Commonwealth v. Tedford***, 960 A.2d 1, 54 (Pa. 2008) ("An actual conflict of interest is evidenced whenever during the course of representation, the interests of appellant—and the interests of another client towards whom counsel bears obligations—diverge with respect to a material factual or legal issue or to a course of action."). The Supreme Court has characterized these situations as subsuming an "active representation" of conflicting interests, ***see, e.g.***, [***Mickens v. Taylor***, 535 U.S. 162, 166 (2002)] (reciting that the Court has foregone inquiry into actual prejudice where "the defendant's attorney actively represented conflicting interests"), which it has recognized as being inherently suspect.

In this respect, *i.e.*, in focusing on the "active" nature of the conflict, the Court's concern centers primarily on the potential for an attorney to alter his trial strategy due to extrinsic considerations stemming from other loyalties, thereby distorting counsel's strategic or tactical decisions in a manner that would not

- 9 -

occur if counsel's sole loyalty were to the defendant. *See, e.g.*, *Wood v. Georgia*, 450 U.S. 261, 272 (1981) (remanding for a determination of adverse effect where the Supreme Court could not be certain whether the defense attorney was "influenced in his basic strategic decisions by the interests of the employer who hired him"). In this vein, courts sometimes assess adverse effect by questioning whether the record shows that counsel "pulled his punches," *i.e.*, failed to represent the defendant as vigorously as he might have done had there been no conflict.

*King*, 57 A.3d at 619 (formatting altered and some citations omitted).[6] The

*King* Court noted "that multiple representation, in itself, does not give rise to

presumed denial of counsel. Rather, the burden remains on the defendant to

demonstrate that the asserted conflict adversely affected his lawyer's

performance." *Id.* at 618 (citations omitted).

---

[6] In the seminal case of *In re Saladin*, 518 A.2d 1258 (Pa. Super. 1986), this Court defined "actual conflict of interest" as follows:

> The Pennsylvania Supreme Court has stated that a conflict of interest actually exists where appellant "has a defense inconsistent with that advanced by the other client, or counsel neglected his case in order to give the other client a more spirited defense." In so stating, the Court was providing examples of actual conflicts of interest; it did not limit the definition to these two situations. The full meaning of "actual conflict of interest" is somewhat broader; such a conflict is evidenced whenever during the course of representation, the interests of appellant—and the interests of another client towards whom counsel bears obligations—diverge with respect to a material factual or legal issue or to a course of action.

*Saladin*, 518 A.2d at 1261 (citations omitted and formatting altered); *accord Commonwealth v. Tharp*, 101 A.3d 736, 754 (Pa. 2014); *King*, 57 A.3d at 619.

In **Commonwealth v. Wilson**, 240 A.2d 498 (Pa. 1968), one attorney represented the appellant and one of appellant's co-defendants, each of whom pleaded guilty to murder. **Wilson**, 240 A.2d at 499. The appellant pursued collateral relief, claiming that the attorney advised him to plead guilty "because a bargain had been reached with the district attorney that if [the appellant] pleaded guilty to murder generally, the Commonwealth would be willing to certify that [the appellant's co-defendant, the attorney's] other client, had committed an offense rising no higher than second degree murder." **Id.** at 500. The **Wilson** Court noted that "if appellant's trial counsel had indeed so compromised appellant's position in order to secure a lighter sentence for another client, this would be an obvious conflict of interest, requiring the grant of a new trial." **Id.** (citation omitted).

The **Wilson** Court denied collateral relief, reasoning that the trial court found the attorney's testimony credible, specifically testimony that "although plea bargains were made concerning both [the appellant and appellant's co-defendant], these were separate arrangements, completely unrelated, and each the sole product of [the attorney's] evaluation of the evidence available against the particular defendant involved." **Id.** (footnote omitted).

> To make the dual representation rise to a true conflict, appellant need not show that actual harm resulted . . . but he must at least show the possibility of harm, *e.g.*, that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense. In the present case, given the lower court's acceptance of [the attorney's] testimony that he advised [the appellant] to enter the plea simply because there was overwhelming evidence

of guilt, and because he had bargained away a death sentence, appellant has failed to show [a] conflict of interest.

*Id.* at 501 (citation omitted and emphasis added).[7]

The ***Wilson*** Court observed that

assuming that [the attorney] had represented only [the appellant], and had still advised him to plead guilty, would this advice have had some reasonable basis designed to effectuate appellant's interest?  Applying this test, we think it clear from our prior discussion that counsel here did the very best thing possible for his client, given the overwhelming evidence of guilt.

*Id.* (citation omitted); ***see also Commonwealth v. Resinger***, 248 A.2d 55, 55 (Pa. 1968) (holding no actual conflict of interest "when one attorney represents two defendants in a joint trial where each has confessed and testified to identical stories . . . while shifting the greatest blame to a third co-defendant").[8]

---

[7] Although the ***Wilson*** Court labeled this as a failure to show a conflict of interest or a true conflict, the ***Saladin*** Court has construed ***Wilson*** as resolving the existence of an "actual" conflict of interest.  *See Saladin*, 518 A.2d at 1261.  The ***King*** Court, similarly, has expressed the view that dual representation must result in an "actual" conflict of interest in order for relief to be granted.  *See King*, 57 A.3d at 619.

[8] The ***Resinger*** Court accepted the attorney's testimony at the collateral relief hearing that the strategy was not "antagonistic but enhanced" by having the two defendants not "cross-examine and impeach each other's story." ***Resinger***, 248 A.2d at 56.  Further, "[c]ounsel is effective (and thus no conflict) if there is a reasonable basis upon which counsel seeks to effectuate his client's interests.  The reasonable basis in the present case was the overwhelming evidence indicating guilt of a felony murder involving both of his clients." *Id.* (citation omitted).  Although the ***Resinger*** Court held there was no conflict of interest, it may be more accurate to view that holding as a conclusion of no "actual" conflict of interest.  *See King*, 57 A.3d at 619; *Saladin*, 518 A.2d at 1261.

In contrast to **Wilson**, in **Commonwealth ex rel. Gass v. Maroney**, 220 A.2d 405 (Pa. Super. 1966), one attorney represented two defendants, who were both "caught by police in the act of removing knives, radios and money from a store." **Maroney**, 220 A.2d at 406. The attorney advised one defendant, who was older and had a criminal record, to plead guilty and the other defendant, who was mentally disabled, to plead not guilty. **Id.** The **Maroney** Court vacated the order denying *habeas* relief without a hearing and remanded for a hearing because the attorney "was faced with the problem of representing two persons who had been arrested together while committing the same acts." **Id.** The **Maroney** Court reasoned that "[t]here is reason to fear, however, that in seeking to save [the mentally disabled defendant], counsel may have failed to adequately protect the rights of [the defendant] who was older and had a criminal record." **Id.**

Instantly, we conclude this case is closer to the facts of **Wilson**, than the facts of **Maroney**. Similar to **Wilson**, in which the attorney testified he advised the appellant "to enter the plea simply because there was overwhelming evidence of guilt," Attorney Quinn testified he advised Appellant to enter a guilty plea because "the evidence was overwhelming." N.T. PCRA Hr'g at 18-19, 49 (discussing review of surveillance videotape and observing this "was about preparation for mitigation in regards to a guilty plea"); **Wilson**, 240 A.2d at 501. To paraphrase the **Wilson** Court, the plea bargain at issue was "the sole product of [Attorney Quinn's] evaluation of the evidence

available against the particular defendant involved." *See Wilson*, 240 A.2d at 500.

Similar to *Resinger* and unlike *Maroney*, there is no indication that Appellant's interests and Damir's interests diverged "with respect to a material factual or legal issue or to a course of action." *See King*, 57 A.3d at 619. As previously quoted above, Attorney Quinn testified that if he only represented Appellant, he would not have changed his defense and would still have recommended that Appellant plead guilty. N.T. PCRA Hr'g at 42. Relatedly, there is no indication that Attorney Quinn favored Damir over Appellant. *Cf. Maroney*, 240 A.2d at 406. In sum, Appellant failed to prove that Attorney Quinn "'pulled his punches,' *i.e.*, failed to represent [Appellant] vigorously as he might have done had there been no conflict." *See King*, 57 A.3d at 619. Appellant has not established that Attorney Quinn "neglected [Appellant's] case in order to give [Damir] a more spirited defense." *See Wilson*, 240 A.2d at 501. *Cf. Maroney*, 220 A.2d at 406.

We acknowledge Appellant's assertion that he established "the possibility of harm" for an actual conflict of interest. *See* Appellant's Brief at 13. Specifically, Appellant references the fact that Damir entered his plea before Appellant and an allegation that the Commonwealth would call Damir to testify if Appellant went to trial. *Id.* at 14-17. Given Attorney Quinn's unequivocal testimony that the defense would have been the same if he only represented Appellant, and the absence of evidence that Attorney Quinn

favored Damir to Appellant's detriment, Appellant has not established that

Attorney Quinn actively represented conflicting interests.[9]  **See King**, 57 A.3d

_____

[9] We also acknowledge that Appellant's appellate brief cited **Jones**, 257 A.2d 367, which involved one attorney representing both the appellant and his co-defendant at trial, and at trial, the co-defendant exonerated himself and incriminated the appellant.  **Jones**, 257 A.2d at 367-68.  The facts in **Jones** are inapt given that in the instant case, the defense strategy was identical for both Appellant and Damir.  **See** N.T. PCRA Hr'g at 42; **Wilson**, 240 A.2d at 501.

Appellant also cited **Johnson**, 299 A.2d 367 in his appellate brief.  **Johnson** is also materially different, because in **Johnson**, the facts were as follows:

> Prior to trial, appellant's co-defendant had pleaded guilty to the charge and had given a statement to the police implicating appellant as the instigator and chief perpetrator of the robbery. At trial, appellant found himself unrepresented and consented to be represented by counsel for his co-defendant.  On the advice of counsel, apparently after being told of his co-defendant's statement, appellant entered a plea of guilty.  Prior to sentencing, counsel for the defendants portrayed appellant as the instigator of the crime and as its moving force, while emphasizing the co-defendant's having played a 'passive part' in the crime.

**Johnson**, 299 A.2d at 368 (footnote omitted).  The **Johnson** Court held that counsel had an actual conflict of interest because "counsel for [the] two defendants play[ed] one off against another to obtain for one of them a favorable sentencing . . . ."  **Id.** at 369.  No such conflict is alleged instantly.

Finally, **Breaker**, 318 A.2d 354, cited in Appellant's brief, is also factually distinguishable.  In **Breaker**, the defendant in question, whose name was Mangold, incriminated ten other defendants, including the appellant. **Breaker**, 318 A.2d at 355-56.

> Several months later appellant, Mangold, and nine other defendants were called for trial.  Although every other defendant was represented by counsel, and Mangold by a privately-retained attorney, when appellant entered the courtroom he was unrepresented.  At that time[,] Mangold's attorney volunteered to

at 619. For these reasons, because Appellant failed to establish PCRA court error, we affirm the PCRA court, although on different grounds. **See Sandusky**, 203 A.3d at 1043-44; **Clouser**, 998 A.2d at 661 n.3.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/01/2021

---

the court that he would act as appellant's counsel. Immediately thereafter, appellant pleaded guilty . . . .

**Id.** at 356. The **Breaker** Court reversed the appellant's convictions because "the attorney by his representation of Mangold compromised his ability to advise appellant disinterestedly. Such representation of appellant may very well have been tainted by the attorney's desire to obtain the best treatment possible for appellant's accuser, Mangold." **Id.** In addition to being factual inapt, Attorney Quinn testified that his defense strategy was the same for both Appellant and co-defendant. **See** N.T. PCRA Hr'g at 42.